1  **WO**
2
3
4
5
6           **IN THE UNITED STATES DISTRICT COURT**
7            **FOR THE DISTRICT OF ARIZONA**
8
9   Robert Towery, et al.,              )   No. CV-12-245-PHX-NVW
                                        )
            Plaintiffs,                 )   <u>DEATH PENALTY CASE</u>
10                                      )
11  vs.                                 )
                                        )   **ORDER DENYING MOTION FOR**
                                        )   **PRELIMINARY INJUNCTION**
12  Janice K. Brewer, et al.,           )
                                        )
13          Defendants.                 )
                                        )
14  _____    )

15          Before the Court is a motion for preliminary injunction filed by Plaintiffs Robert

16  Towery and Robert Moormann, who are Arizona prisoners under sentence of death.[1]  (Doc.

17  19.)  Moormann is scheduled to be executed on Wednesday, February 29, 2012, and Towery

18  is scheduled to be executed on Thursday, March 8, 2012.  On February 6, 2012, Plaintiffs

19  filed a complaint pursuant to 42 U.S.C. § 1983, challenging the manner and means by which

20  the Arizona Department of Corrections ("ADC") intends to execute condemned inmates by

21  lethal injection.  (Doc. 1.)  An amended complaint was filed on February 10, and the instant

22  motion was filed on February 14.  (Docs. 8, 19.)  The Court held a preliminary injunction

23  hearing on February 22 and has also considered the complaint, the motion, and all responsive

24  pleadings.  This order states the Court's findings of fact and conclusions of law.  For the

25  reasons that follow, the Court denies the motion for stay of execution.

26  _____

27          [1]Other Arizona capital prisoners are plaintiffs to this action but none have an
    impending execution date.  Therefore, throughout this order the term "Plaintiffs" will refer
28  to Towery and Moormann, as they are the only plaintiffs seeking preliminary injunctive
    relief.

**BACKGROUND**

The facts underlying Plaintiffs' convictions and capital sentences are detailed in the Arizona Supreme Court's appellate decisions and will not be repeated here.  *See State v. Towery*, 186 Ariz. 168, 174, 920 P.2d 290, 296 (1996); *State v. Moormann*, 154 Ariz. 578, 744 P.2d 679 (1987).  Because Plaintiffs committed their crimes before November 23, 1992, under Arizona law they have the choice to be executed by either lethal injection or lethal gas.  *See* Ariz. Rev. Stat. § 13-757(B).  According to the complaint, Plaintiffs have declined to choose.  Consequently, ADC must use lethal injection to execute them.  *Id.*

In 2007, a group of Arizona death row prisoners filed a § 1983 complaint challenging numerous aspects of Arizona's then-in-effect lethal injection protocol.[2]  That protocol was based on Department Order 710, dated November 1, 2007, and as modified by an exhibit submitted by the parties as part of a joint report to the Court.  *See Dickens v. Brewer*, No. CV-07-1770-PHX-NVW, 2009 WL 1904294, at *1 & n.2 (D. Ariz. Jul. 1, 2009) (unpublished order).  This Court granted summary judgment in favor of Defendants, concluding that Arizona's protocol was "substantially similar" to that approved by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), and thus did not subject inmates to a substantial risk of serious harm in violation of the Eighth Amendment.  The Ninth Circuit Court of Appeals affirmed.  *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).

The version of the protocol at issue in *Dickens* required sequential administration of: (1) sodium thiopental (pentothal), an ultra fast-acting barbiturate that induces unconsciousness; (2) pancuronium bromide, a paralytic neuromuscular blocking agent that prevents any voluntary muscle contraction; and (3) potassium chloride, which causes skeletal muscle paralysis and cardiac arrest.  "It is uncontested that, failing a proper dose of sodium thiopental that would render [a] prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."  *Baze*, 553 U.S. at 53.

---

[2]     None of the Plaintiffs in this matter were parties to that litigation.

- 2 -

1        In October 2010, on the eve of his execution, Arizona prisoner Jeffrey Landrigan filed
2    a § 1983 complaint describing a nationwide shortage of sodium thiopental and alleging that
3    ADC had imported the drug from a non-FDA-approved foreign manufacturer. The district
4    court granted a temporary restraining order to permit further discovery regarding efficacy of
5    the drug. *Landrigan v. Brewer*, No. CV-10-2246-PHX-ROS, 2010 WL 4269559 (D. Ariz.
6    Oct. 25, 2010) (unpublished order). The Supreme Court reversed, noting that there was "no
7    evidence in the record to suggest that the drug obtained from a foreign source is unsafe" and
8    "no showing that the drug was unlawfully obtained." *Brewer v. Landrigan*, 131 S. Ct. 445
9    (2010) (Mem.).

10       Subsequently, Arizona prisoner Daniel Cook filed a complaint similar to that of
11   Landrigan, alleging an unconstitutional risk of serious pain from use of non-FDA approved
12   sodium thiopental. The district court dismissed the complaint, finding that it failed to
13   sufficiently state a claim for relief. *Cook v. Brewer*, No. CV-10-2454-PHX-RCB, 2011 WL
14   251470 (D. Ariz. Jan. 26, 2011) (unpublished order). The Ninth Circuit affirmed and noted
15   that Arizona's protocol contains safeguards that would prevent the administration of the
16   second and third drugs if the prisoner were not sufficiently anesthetized. *Cook v. Brewer*,
17   637 F.3d 1002, 1007-08 (9th Cir. 2011) (*Cook I*). Based on newly-discovered evidence
18   surrounding the foreign-manufactured sodium thiopental and ADC's acquisition thereof,
19   Cook refiled a complaint on the eve of his execution. The district court summarily dismissed
20   the complaint, and the Ninth Circuit affirmed. *Cook v. Brewer*, No. CV-11-557-PHX-RCB,
21   2011 WL 1119641 (D. Ariz. Mar. 28, 2011) (unpublished order), *aff'd*, 649 F.3d 915 (9th
22   Cir.) (*Cook II*), *cert. denied*, 131 S. Ct. 2465 (2011).

23       On May 24, 2011, the night before the scheduled execution of Arizona prisoner
24   Donald Beaty, ADC notified Beaty and the Arizona Supreme Court that it intended to
25   substitute pentobarbital for sodium thiopental in carrying out Beaty's execution but that the
26   remaining aspects of the lethal injection protocol would be followed. In this notice, ADC
27   also stated that the change was necessitated by information it had received that day from the
28   United States Department of Justice, indicating that ADC's supply of sodium thiopental was

- 3 -

1   imported without compliance with the Controlled Substances Act and could not be used.

2       Beaty filed a § 1983 complaint, asserting a due process violation from insufficient

3   notice and arguing that a last-minute drug substitution would make it impossible for ADC

4   to comply with the protocol's training requirement, thus subjecting him to a substantial risk

5   of pain and suffering.  This Court denied injunctive relief, concluding that the lack of

6   practice with pentobarbital was insufficient to demonstrate a risk of serious harm in light of

7   the protocol's safeguards ensuring the prisoner's anesthetization prior to administration of

8   pancuronium bromide and potassium chloride.  *Beaty v. Brewer*, 791 F.Supp.2d 678, 684 (D.

9   Ariz. 2011).  The Ninth Circuit affirmed.  *Beaty v. Brewer*, 649 F.3d 1071 (9th Cir.), *cert.*

10  *denied*, 131 S. Ct. 2929 (2011).

11      On June 10, 2011, ADC amended Department Order 710 to provide for the

12  administration of sodium thiopental or pentobarbital as the first of the three sequentially-

13  administered drugs in its lethal injection protocol.

14      On July 15, 2011, Thomas West, along with the plaintiffs in *Dickens*, filed a § 1983

15  complaint challenging ADC's implementation of its lethal injection protocol.  Specifically,

16  the plaintiffs alleged that ADC's failure to follow its written protocol and addition of

17  pentobarbital created a substantial risk of unnecessary pain and violated their rights to due

18  process and equal protection.  West also sought emergency injunctive relief to enjoin his

19  impending execution, which was denied.  *See West v. Brewer*, CV-11-1409-PHX-NVW,

20  2011 WL 2836754 (D. Ariz. Jul. 18, 2011) (unpublished order),  *aff'd,* 652 F.3d 1060 (9th

21  Cir.), *cert. denied*, 131 S. Ct. 3092 (2011).  Thereafter, this Court denied a motion for

22  summary dismissal and ordered expedited discovery.

23      Following a bench trial in December 2011, the Court entered judgment against the

24  *West* plaintiffs, finding no constitutional infirmities from ADC's implementation of its lethal

25  injection protocol.  *West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL 6724628 (D.

26  Ariz. Dec. 21, 2011) (unpublished order), *appeal docketed*, No. 12-15009 (9th Cir. Jan. 3,

27  2012).   In particular, the Court determined that none of the complained-of

28  deviations—default use of a femoral central intravenous ("IV") line; failure to conduct

- 4 -

1    required background checks of the IV team members, document their qualifications, and
2    ensure IV-setting as part of their current professional duties; and failure to affix multiple
3    labels on syringes and accurately document disposal of unused drugs—created a substantial
4    risk the plaintiffs would be improperly anesthetized or otherwise suffer needless suffering
5    and severe pain.  The Court noted that ADC Director Charles L. Ryan has "discretion to
6    deviate from the written protocol when safety, security, or medical issues in individual
7    circumstances require temporary deviation from the written protocol." *Id.* at *11.  However,
8    the Court further observed that the written protocol should reflect actual practice and should
9    be amended if "ADC no longer intends to follow the protocol as currently written." *Id.*

10        On January 25, 2012, ADC again amended Department Order 710 ("the January 2012
11   Protocol").  The revised protocol permits execution using either a three-drug or one-drug
12   protocol and requires ADC's director to choose between these two protocols at least seven
13   days prior to a scheduled execution.  Ariz. Dep't Corr., Dep't Order 710, § 710.01, ¶ 1.1.2.4
14   & Attach. D, § C.1 (Jan. 25, 2012) (hereinafter "DO 710 (Jan. 2012)").  The protocol further
15   directs that the director, upon consultation with the IV team leader, shall determine the
16   catheter sites and that a central femoral venous line may not be utilized unless placed by a
17   medically-licensed physician with relevant experience.  DO 710 (Jan. 2012), § 710.02, ¶
18   1.2.5.4 & Attach. D, § E.1.

19        The January 2012 Protocol also changed the composition and experience requirements
20   for the IV (Medical) team:

21        The IV Team will consist of any two or more of the following: physician(s),
     physician   assistant(s),   nurse(s),   emergency   medical   technician(s),
22        paramedic(2), military corpsman, phlebotomist(s) *or other appropriately*
     *trained personnel* including those trained in the United States Military.  All
23        team members shall have at least one year of relevant experience in placing
     either peripheral or central femoral intravenous lines.
24
25   DO 710 (Jan. 2012), § 710.02, ¶ 1.2.5.1 (emphasis added).  The previous version used the
     phrase "or other medically trained personnel" instead of "other appropriately trained
26
     personnel" and required one year of "*current* and relevant *professional* experience in their
27
     assigned duties on the Medical Team" rather than just one year of "relevant experience."
28

- 5 -

Ariz. Dep't Corr., Dep't Order 710, Attach. D, § B.1 (Sept. 12, 2011) (hereinafter "DO 710 (Sept. 2011)").  In addition, the revised protocol requires IV team members to participate in "at least one training session with multiple scenarios within one day prior to a scheduled execution" rather than ten execution "rehearsals" annually as previously required.  DO 710 (Jan. 2012), §§ 710.02, ¶ 1.1.2, 710.02, ¶ 1.2.5.5; DO 710 (Sept. 2011), Attach. D, § B.5. Finally, the revised protocol permits only telephonic contact between an inmate and his attorney after 9:00 p.m. the night before a scheduled execution, whereas previously counsel were permitted unlimited non-contact visitation.  DO 710 (Jan. 2012), § 710.11, ¶ 1.5; DO 710 (Sept. 2011), § 710.09, ¶ 1.5.

# DISCUSSION

In their complaint, Plaintiffs allege that ADC's revised protocol impermissibly eliminates safeguards, increases the ADC director's discretion, and codifies arbitrary and disparate treatment of capital prisoners, in violation of the Eighth and Fourteenth Amendments.  Plaintiffs further allege constitutional violations from ADC's intent to execute them using the three-drug protocol, including use of pancuronium bromide imported from a foreign source, instead of the one-drug option.  Finally, Plaintiffs allege that the January 2012 Protocol violates their due process right to notice concerning the specific drugs and venous access to be used during execution and their right of access to counsel and the courts. Plaintiffs have moved for a preliminary injunction to enjoin their execution to allow for litigation of these claims.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).  An injunction may be granted only where the movant shows that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Beardslee v. Woodford*, 395 F.3d 1064, 1067 (9th Cir. 2005).  Under the "serious questions" version of the sliding-scale test,

- 6 -

a preliminary injunction is appropriate when a plaintiff demonstrates that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011) (citation omitted). This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another. "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.*

In the context of a capital case, the Supreme Court has emphasized that these principles apply when a condemned prisoner asks a federal court to enjoin his impending execution because "[f]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573, 583-84 (2006). Rather, "a stay of execution is an equitable remedy" and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.* at 584.

**I.     Likelihood of Success**

  **A.     Lack of Necessary Safeguards**

Plaintiffs allege in Claim Two of their complaint that the January 2012 Protocol is facially invalid under the Eighth Amendment because it lacks safeguards necessary to reduce a substantial risk of pain and suffering from implementation of the three-drug protocol. Specifically, Plaintiffs allege that the following are required to sustain constitutionality of Arizona's protocol: (1) IV team members must have "current" professional experience setting IV lines; (2) IV team members must be medically trained; (3) IV team members must attend more than one training session on the day before an execution and must practice siting IVs during training; (4) there must be a time limitation for finding and setting IV catheters; and (5) the IV team must establish both a primary and a back-up IV line. (Doc. 8 at 21.)

The Eighth Amendment "prohibits punishments that involve the unnecessary and

wanton inflictions of pain, or that are inconsistent with evolving standards of decency that mark the progress of a maturing society." *Cooper v. Rimmer*, 379 F.3d 1029, 1032 (9th Cir. 2004).   That prohibition necessarily applies to the punishment of death, precluding executions that "involve torture or a lingering death, or do not accord with the dignity of man." *Beardslee v. Woodford*, 395 F.3d at 1070 (internal citations omitted).  A violation of the Eighth Amendment can be established by demonstrating there is a "substantial risk of serious harm" that is sure or very likely to cause pain and needless suffering. *Dickens v. Brewer*, 631 F.3d at 1144-46 (adopting *Baze* plurality); *see also Brewer v. Landrigan*, 131 S. Ct. at 445.  The risk must be an "'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Baze*, 553 U.S. at 50 (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

In their motion for injunctive relief, Plaintiffs argue that during the *Dickens* litigation ADC amended its protocol to add safeguards that made it substantially similar to the Kentucky protocol upheld in *Baze* in order to win on summary judgment and that elimination of these provisions puts the January 2012 Protocol outside the *Baze* safe harbor.  In the recent *West* litigation, however, this Court explained that during the *Dickens* litigation ADC had "mooted some aspects of Plaintiffs' facial challenge by promising to follow a written protocol that was amended to closely conform to the protocol approved in *Baze*." *West*, 2011 WL 6724628, at *11.  The Court further noted that whether "any of the amendments were constitutionally required was not adjudicated." *Id.*  Thus, there has been no determination that the specific provisions of the protocol litigated in *Dickens* were constitutionally mandated, and the issue here is not whether the Eighth Amendment is offended by the fact ADC has again amended its lethal injection procedures.  Rather, the question is whether there exists a "risk of pain from maladministration" under the newly revised protocol. *Baze*, 553 U.S. at 41; *see also Dickens*, 631 F.3d at 1150 ("If Arizona amends the Protocol to modify the current safeguards, Dickens—or another affected death row inmate—may be able to challenge the constitutionality of the amended protocol.").

In considering Plaintiffs' Eighth Amendment challenge to the January 2012 Protocol,

the Court is guided by the Supreme Court's observation in *Baze* that "[s]ome risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure." 553 U.S. at 47. A risk of future harm can qualify as cruel and unusual punishment only if the conditions presenting the risk are sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers. *Id.* at 49-50 (citations omitted). "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual" under the Eighth Amendment. *Id.* at 50.

Plaintiffs argue that the January 2012 Protocol "allows minimally qualified or incompetent personnel to conduct executions" because it no longer requires that the IV Team members have medical training, have current experience setting IVs, or be personally interviewed before being selected to participate in an execution. (Doc. 8 at 12, 21.) Plaintiffs also take issue with Arizona's failure to require the IV Team to conduct ten training sessions per year, as previously mandated, and failure to include setting IV lines on volunteers as part of the IV Team's training, a provision also absent from the protocol upheld in *Dickens*. In Plaintiffs' view, the January 2012 Protocol significantly lowers the qualification requirements for members of the IV Team by eliminating altogether any requirement that such persons be "qualified." (Doc. 19 at 5.) Defendants disagree and assert they modified the protocol to reflect the practice this Court found constitutional in *West*.

In *West*, the Court had to determine whether deviations between the written protocol and ADC's practice in choosing members of the IV Team rose to an Eighth Amendment violation. In doing so, the Court found that ADC's deviation from the "current experience" requirement—that Medical/IV Team members have one year of *current* experience in their assigned execution-related duties—was reasonable in light of both the difficulty in locating qualified individuals and the IV Team's extensive past experience:

> With respect to MTM-IV, approximately fifteen years had passed since he last placed a peripheral IV while in the military, but he had served as a corpsman for eight years, setting IVs on a weekly basis. He thus had

1    extensive, albeit not recent, experience with peripheral IV lines. Division
2    Director Patton interviewed MTM-IV prior to his selection, ADC administered
     a psychological fitness exam, and MTM-IV participated in numerous training
3    exercises before each execution. There also is no evidence that any problems
     arose during the past five executions due to MTM-IV's participation.

4         At the time MTL was first contacted by ADC about participating in the
5    Comer execution, he was employed as an emergency room physician and
     regularly placed central IV lines. Shortly thereafter, he became a clinic
6    physician but continued to work once a month in the emergency department
     for some months. Director Ryan first spoke with MTL by telephone and
7    accompanied him to Florence for the practice sessions preceding Landrigan's
     execution in October 2010. Based on his conversations with MTL, Ryan was
8    satisfied that MTL was qualified, and MTL in fact had ample knowledge and
     experience needed to set a central line.

9    *West*, 2011 WL 6724628, at *13. Based on this Court's determination that both MTM-IV

10   and MTL were qualified to serve on the IV Team despite the lack of current experience,

11   ADC amended its protocol to remove the "current" experience requirement. In doing so,

12   however, they made two other changes of significance here: permitting any "appropriately

13   trained personnel" (not just "medically trained") to serve on the IV Team and eliminating the

14   necessity that an IV Team member's one year of relevant experience be "professional"

15   experience. The question for this Court is whether the revised protocol, on its face, takes

16   Arizona outside of *Baze*'s safe harbor. The Court concludes that it does not.

17        In *Baze*, the Court found that Kentucky had "put in place several important safeguards

18   to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner."

19   553 U.S. at 55. It noted that the "most significant" of these is the requirement that members

20   of the IV team have "at least one year of professional experience as a certified medical

21   assistant, phlebotomist, EMT, paramedic, or military corpsman." *Id.* Although the Court

22   noted that Kentucky "currently uses a phlebotomist and an EMT, personnel who have daily

23   experience establishing IV catheters for inmates in Kentucky's prison population," the Court

24   did not affirmatively state that "current" experience was constitutionally mandated. *Id.*; *see*

25   *also Nooner v. Norris*, 594 F.3d 592, 605 & n.7 (8th Cir. 2010) (noting that "most

26   significant" Kentucky safeguard to *Baze* plurality was requirement IV team have at least one

27   year of professional experience, not that they insert catheters on a daily basis). The Court

28   also observed that members of Kentucky's IV team participated in at least ten practice

- 10 -

1   sessions per year, including the siting of IV catheters into volunteers, but again did not

2   affirmatively hold that this level of training was constitutionally mandated.  *Id.* at 55.

3        Under Arizona's revised protocol, only physicians, physician assistants, nurses,

4   emergency medical technicians, paramedics, military corpsmen, phlebotomists, "or other

5   appropriately trained personnel" with "at least one year of relevant experience in placing

6   either peripheral or central femoral intravenous lines" may serve on the IV Team.  DO 710

7   (Jan. 2012), § 710.02, ¶ 1.2.5.1.  The protocol further provides that IV Team members will

8   be selected by ADC's director after "review of the proposed team member's qualifications,

9   training, experience, and/or any professional license(s) and certification(s) they may hold"

10  and that ADC's Inspector General's Office shall conduct licensing and criminal history

11  reviews prior to assigning or retaining any IV Team member and upon issuance of a warrant

12  of execution.  *Id.* at ¶ 1.2.5.2.  In addition, the revised protocol requires IV Team members

13  to participate in at least one training session "with multiple scenarios" within one day of a

14  scheduled execution.  *Id.* at ¶ 1.1.2.

15       At bottom, Plaintiffs' claim rests on speculation that ADC will enlist unqualified

16  personnel to serve on the IV Team under the catch-all "other appropriately trained personnel"

17  category.  In response to this Court's questioning about the scope of the term "appropriately

18  trained," counsel for Defendants acknowledged at the preliminary injunction hearing that the

19  training qualifications for such individuals would be no less than what is required of

20  individuals licensed to perform intravenous procedures.  In addition to the "appropriately

21  trained" requirement, the director's discretion in selecting IV Team members is

22  circumscribed by the requirement that IV Team members have at least one year of experience

23  placing either peripheral or central intravenous lines.  With regard to the latter, the revised

24  protocol requires that only medically-licensed physicians with relevant experience insert

25  femoral central lines (and that a current licensing review be conducted prior to a scheduled

26  execution); Plaintiffs' allegation that the protocol "allows unqualified individuals to insert

27  central, femoral lines" ignores this clear mandate.  (Doc. 30 at 11.)

28       In *West*, the Court observed that the Eighth Amendment does not require the

- 11 -

participation of licensed medical professionals in lethal injection executions. *West*, 2011 WL 6724628, at *13. In his *Baze* concurrence, Justice Alito observed that numerous medical professional associations, including the American Medical Association, the American Nurses Association, and the National Association of Emergency Medical Technicians, have ethical proscriptions against participation in executions. *Baze*, 553 U.S. at 64-66 (Alito, J., concurring). This then creates a dilemma for departments of corrections who are charged with enlisting qualified personnel to place IVs for execution by lethal injection. Although Arizona law protects the identity of those involved in executions and directs that no licensing board may suspend or revoke a member's license due to participation in an execution, *see* Ariz. Rev. Stat. § 13-757, there is still a risk of ostracization if someone's identity were inadvertently revealed as well as the possibility of having to participate in depositions and testify in court, as occurred in the *West* litigation.

Arizona has revised its protocol to eliminate the requirement that IV Team members set IVs as part of their current employment and to broaden the scope of personnel who may be selected to include those who are "appropriately trained" even if not a physician, physician's assistant, nurse, emergency medical technician, paramedic, military corpsman, or phlebotomist. This may be less restrictive than standards adopted by other states. However, the protocol on its face requires that IV Team members be appropriately trained to place IVs and have at least one year of experience setting IVs. The Court finds that this is sufficient, when combined with the numerous other safeguards addressed below, to ameliorate the risk a prisoner will not be sufficiently anesthetized. Moreover, this Court presumes ADC's director will properly discharge his official duties when selecting IV team members, *Bracy v. Gramley*, 520 U.S. 899, 909 (1997), and nothing in ADC's execution history suggests otherwise. In sum, the mere possibility an unqualified person may be selected to serve on the IV Team does not demonstrate a risk of substantial harm. *See Baze*, 553 U.S. at 50 ("Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual."). The Court also notes that

1   Director Ryan has informed Plaintiffs here that for their impending executions ADC "has a
2   qualified IV Team in place.  The Inspector General has completed all necessary background
3   checks on all of the IV Team members, and all of these team members meet the qualifications
4   specified in the protocol."  (Doc. 16-1 at 31.)

5        Plaintiffs also complain that IV Team members are not required to have experience
6   mixing or preparing drugs, monitoring the level of consciousness, or establishing time of
7   death.[3]  (Doc. 19 at 5.)  However, such experience was neither required in ADC's prior
8   protocol nor mandated by *Baze*.  Indeed, the *Baze* Court expressly declined to find fault with
9   Kentucky's employment of "untrained personnel" to mix the drugs and rejected the argument
10  that medically-trained professionals were necessary to assess consciousness.  553 U.S. at 54-
11  56, 59-60.

12       Admittedly, there are variances between Arizona's revised protocol and that approved
13  in *Baze* regarding qualifications and training of IV Team members.  However, the Court is
14  not persuaded that these differences are "constitutionally significant" in light of *Baze*'s
15  "broad" safe harbor.  *Raby v. Livingston*, 600 F.3d 552, 560 (5th Cir. 2010) (rejecting
16  suggestion that Eighth Amendment satisfied only if "lethal injection practices actually
17  implemented in Kentucky and [the challenged state] were identical in all respects.").  Indeed,
18  selection of an experienced IV Team is only one of a panoply of safeguards against
19  maladministration of the first drug.  Arizona's protocol includes numerous other measures
20  to ensure that an adequate dose of barbiturate is administered, and each of these were in the
21  protocol version upheld in *Dickens*.

22

23

24       [3]Plaintiffs also reassert a point raised in *West* that the Medical Team Leader who
    conducted consciousness checks in the past five executions said during his deposition that
25  he would be unable to determine if a prisoner was conscious but paralyzed, or actually
    unconscious.  (Doc. 30 at 4.)  However, as the Court explained in *West*, the team leader
26  "conducts the consciousness check only after administration of the anesthetic, not the
    paralytic.   Thus, Plaintiffs' argument rests on the speculative assumption that the
27  pancuronium bromide will be mistakenly administered before the sodium thiopental or
28  pentobarbital."  *West*, 2011 WL 6724628, at *18.

1    First, the protocol requires use of a back-up catheter.  In *Baze*, the Court noted that

2 "an additional dose can be given through the backup line before the last two drugs are

3 injected" in the event an insufficient dose of barbiturate is initially administered through the

4 primary line.  553 U.S. at 55.  Plaintiffs contend the January 2012 Protocol is "unclear and

5 contradictory on the question of whether a back-up catheter is required."  (Doc. 8 at 15.)

6 They point to a reference in the protocol to "catheter(s) site(s)," suggesting that a single

7 catheter will be used, and to an instruction that the IV Team is responsible "for inserting

8 *either peripheral IV catheters or a central femoral line*," suggesting "that there would either

9 be two peripheral catheters or one central line."  (*Id.*)  However, the protocol states in no

10 uncertain terms that "[t]he IV Team members shall insert a primary IV catheter and a backup

11 IV catheter."  DO 710 (Jan. 2012), Attach. D, § E.1.  This is not an ambiguous directive.

12    Second, the protocol mandates that a flow of heparin/saline "be started in each line

13 and administered at a slow rate to keep the line open." *Id.* at § E.2.  Running saline through

14 the IV lines after they are placed ensures that there are no blockages and that they are

15 operating properly before any lethal drugs are administered.  This greatly reduces the risk of

16 maladministration from any initial difficulties establishing the IV lines.  *See Raby*, 600 F.3d

17 at 558 (finding no risk of pain from problems with IV insertion because protocol requires IV

18 to flow properly for several minutes before lethal drugs are administered); *Taylor v.*

19 *Crawford*, 487 F.3d 1072, 1085 (8th Cir. 2007) (ensuring an IV is working and not

20 obstructed is one of the built-in checks that  "renders any risk of pain far too remote to be

21 constitutionally significant").

22    Third, the warden stays in the execution room and has an unobstructed view of the

23 catheter sites.  DO 710 (Jan. 2012), Attach. D, at §§ E.4-E.5.  This, the Court explained in

24 *Baze*, allows the warden to "watch for signs of IV problems, including infiltration." 553 U.S.

25 at 56.  "[I]dentifying signs of infiltration would be 'very obvious,' even to the average

26 person, because of the swelling that would result."  *Id.*

27    Most significantly, Arizona has enacted several consciousness checks the Court in

28 *Baze* declined to find necessary to reduce the risk a prisoner will not be sufficiently sedated.

- 14 -

*Dickens*, 631 F.3d at 1146.  Specifically, the protocol requires use of an electrocardiograph and directs the IV Team to "continually monitor the inmate's level of consciousness and electrocardiograph readings, maintaining constant observation of the inmate utilizing direct observation, audio equipment, camera and monitor as well as any other medically approved method(s) deemed necessary by the IV Team Leader."  DO 710 (Jan. 2012), Attach. D, § D.9.  The protocol further directs the IV Team Leader to "physically confirm the inmate is unconscious by using all necessary medically appropriate methods" and to reconfirm the IV line remains affixed and functioning properly after administration of the barbiturate drug. *Id.* at § F.5.  In contrast, the Court in *Baze* found that visual inspection of the IV site by the warden and deputy warden is sufficient to determine whether the first drug has entered an inmate's bloodstream and declined to require that states adopt "sophisticated procedures," such as use of an Bispectral Index monitor, blood pressure cuff, EKG, or other "tests for checking consciousness–calling the inmate's name, brushing his eyelashes, or presenting him with strong, noxious odors," to determine anesthetic depth.  *Baze*, 553 U.S. at 59-60.

Finally, Plaintiffs argue that a time limitation for setting IV lines is a necessary safeguard to prevent the risk they "will suffer a lingering death." (Doc. 8 at 21.)  "But an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the State could take as a failsafe for other, independently adequate measures."  *Baze*, 553 U.S. at 60-61.  Rather, the alternative procedure being proposed "must be feasible, readily implemented, and in fact *significantly* reduce a *substantial* risk of *severe* pain."  *Id.* at 52 (emphasis added).  Plaintiffs' Eighth Amendment claim is based on the risk of excruciating pain that would result if the second and third drugs of the three-drug protocol were administered absent the sedative effect produced by proper administration of the first drug, not on any minor pain involved in multiple attempts to locate an adequate vein.  If the IV Team is unable to set a working IV line, Arizona's protocol precludes the administration of any lethal chemicals.  Consequently, a time limit to set IVs is not the type of alternative procedure that "in fact significantly reduce[s] a substantial risk of severe pain" and is therefore not constitutionally mandated.  *Id.* at 52.

1   For the above reasons, the Court concludes that Plaintiffs have not carried their burden
2   of proving they are likely to succeed on the merits of their Eighth Amendment facial
3   challenge to ADC's revised protocol.

4       **B.    Disparate Treatment**

5       Plaintiffs allege in Claim One of their complaint that the January 2012 Protocol is
6   facially invalid under the Fourteenth Amendment's Equal Protection Clause because it vests
7   unconditional discretion in ADC's director to choose whether to employ the three-drug or
8   one-drug protocol, to select execution team members, to eliminate use of a backup catheter,
9   and to choose the anesthetic drug to be administered.  Plaintiffs argue that Defendants have
10  no compelling state interest in, or rational basis for, treating condemned prisoners differently.
11  They further argue that the lack of guidelines or standards for determining when and under
12  what circumstances such distinctions may be warranted will result in equal protection
13  violations.

14      As a preliminary matter, the Plaintiffs misread the January 2012 Protocol with regard
15  to use of a backup catheter.  Unlike the provisions vesting discretion concerning the chemical
16  protocol and drugs to be employed and selection of execution team members, the protocol
17  does not affirmatively require the director to choose whether a backup catheter will be
18  utilized.  Instead, the protocol directs that the "IV Team members shall insert a primary IV
19  catheter and a backup IV catheter."  DO 710 (Jan. 2012), Attach. D, § E.1.  As already noted,
20  this directive is unambiguous.

21      The Equal Protection Clause of the Fourteenth Amendment commands that no State
22  shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S.
23  Const. amend. XIV, § 1.  A state practice that discriminates against a suspect class of
24  individuals or interferes with a fundamental right is subject to strict scrutiny.  *Massachusetts*
25  *Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).  Plaintiffs allege that codifying disparate
26  treatment across executions without a principled basis for determining when deviations are
27  warranted impairs their fundamental right to be free from cruel and unusual punishment.
28  However, as just discussed, Plaintiffs have not demonstrated that the January 2012 Protocol

- 16 -

subjects them to a substantial risk of serious harm in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.   Accordingly, Plaintiffs have not demonstrated that the revised protocol interferes with a fundamental right, and strict scrutiny review is inapplicable.

Plaintiffs also allege that they are, individually, a "class of one."  The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).  However, the Court later narrowed the scope of such claims, recognizing that not all state actions resulting in disparate treatment raise equal protection concerns.  *See Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601 (2008).

In *Engquist*, the Court held that the class-of-one theory of equal protection has no application in the public employment context because it is a "poor fit" in a situation involving discretionary decisionmaking.  *Id.* at 605.  The Court reasoned that such a theory is workable only where there is some "clear standard against which departures, even for a single plaintiff, could be readily assessed."  *Id.* at 602.  In other words, where an official has discretion to make a decision "based on a vast array of subjective, individualized assessments," "the rule that people should be 'treated alike, under like circumstances and conditions' is not violated . . . because treating like individuals differently is an accepted consequence of the discretion granted."  *Id.* at 603 (citations omitted).  The Court concluded:

> To treat employees differently is not to classify them in a way that raises equal protection concerns.  Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship.  A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

*Engquist*, 553 U.S. at 605.

Although *Engquist* addressed state action specifically within the public employment context, numerous courts have extended its rationale to other contexts in which a plaintiff challenges discretionary state action under a class-of-one theory.  For example, in *Flowers*

*v. City of Minneapolis*, the Eighth Circuit applied *Engquist*'s rationale to police investigative decisions, concluding that a "police officer's decisions regarding whom to investigate and *how* to investigate are matters that necessarily involve discretion."  558 F.3d 794, 799 (8th Cir. 2009) (emphasis added).  And in *Dawson v. Norwood*, the district court concluded that the class-of-one equal protection theory has no place "in the context of prison officials making discretionary decisions concerning inmates."  No. 1:06-cv-914, 2010 WL 2232355, at *2 (W.D. Mich. June 1, 2010) (unpublished order); *see also Upthegrove v. Holm*, No. 09-cv-206, 2009 WL 1296969, at *1 (W.D. Wis. May 7, 2009) (unpublished order) (observing that class-of-one equal protections claims "not cognizable in such an individualized and discretionary setting as the prison setting" and dismissing claim based on prison official's decision about clothing inmate could wear at a particular time).

Like many states, Arizona leaves the precise protocol for carrying out executions by lethal injection to the discretion of the state's department of corrections.  Ariz. Const. art. XXII § 22 ("The lethal injection or lethal gas shall be administered under such procedures and supervision as prescribed by law."); Ariz. Rev. Stat. § 13-757(A) ("The penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections.").  In addition, rules created by ADC are exempt from the general rule-making provisions of Arizona's Administrative Procedures Act.  Ariz. Rev. Stat. § 41-1005(A)(23).  Thus, ADC has broad discretion in devising the manner and means for carrying out executions by lethal injection, constrained generally by the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment.  *Cf. Lightbourne v. McCollum*, 969 So.2d 326 (Fla. 2007) ("[T]his Court's role is not to micromanage the executive branch in fulfilling its own duties relating to executions.  We will not second-guess the DOC's personnel decisions, so long as the lethal injection protocol reasonably states, as it does here, relevant qualifications for those individuals who are chosen.").

In their complaint, Plaintiffs acknowledge that all details and methods involved in the execution process "are to be determined at the sole discretion of ADC," including the drugs,

dosages, drug combinations, and manner of intravenous line access to be used in the execution process.  (Doc. 8 at 6.)  And as Plaintiffs further note, Arizona law does not set forth any requirements for certification, training, or licensing of those individuals who participate in the execution process.  (*Id.*)  Accordingly, ADC has exercised its discretion to draft over 30 pages of detailed execution procedures.  Although the vast majority of Department Order 710 contains clear directives, some aspects are left to the discretion of ADC's director for determination on a case-by-case basis, including selection of the execution team members and whether the prisoner will be executed using a three- or one-drug protocol.

Plaintiffs assert generally that clear standards "must exist" for determining when and under what circumstances ADC's director will choose the chemical protocol to administer or determine who is qualified to serve on the IV Team.  (Doc. 8 at 19.)  The only legal authority cited for this proposition is a series of decisions by a district court in Ohio.  *See In re Ohio Execution Protocol Litig.*, ___ F.Supp.2d ___, 2012 WL 84548 (S.D. Ohio Jan. 11, 2012), *motion to vacate stay denied by*, ___ F.3d ___, 2012 WL 118322 (6th Cir. Jan. 13, 2012), and ___ S. Ct. ___, 2012 WL 385467 (U.S. Feb. 8, 2012); *Cooey v. Kasich*, 801 F.Supp.2d 623 (S.D. Ohio 2011)  However, the court's rulings there hinged upon "persistent failure or refusal of the State to follow its own written execution protocol," *In re Ohio Execution Protocol Litig.*, ___ F.3d at ___, 2012 WL 118322, at *1, rather than on the protocol's lack of standards to guide discretionary decisionmaking; thus, they are inapposite. The only appellate court to squarely address the issue raised here found "no support for [the] 'novel proposition' that the Equal Protection Clause requires a written execution protocol sufficiently detailed to ensure that every execution is performed in a precisely identical manner."  *DeYoung v. Owens*, 646 F.3d 1319, 1327 (11th Cir.), *cert. denied*, 132 S. Ct. 46 (2011).

The fact that ADC has chosen to delegate some execution-related decisions to the sole discretion of ADC's director is itself a discretionary decision.  Although the choices made by the director may result in some variances during the execution process for different

prisoners (e.g., composition of the execution team), such differences are "an accepted consequence of the discretion granted" to ADC under state law. *Engquist*, 553 U.S. at 603. Thus, the class-of-one doctrine does not extend to either the discretionary decisionmaking employed when ADC revises its lethal injection protocol or to discretionary decisions made by the director pursuant to that protocol.[4]   To prohibit states from revising execution protocols or vesting discretionary decisionmaking within such protocols would "substantially intrude on the role of state legislatures in implementing their execution procedures." *Baze*, 553 U.S. at 51 (citing *Bell v. Wolfish*, 441 U.S. 520, 562 (1979) ("The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.")).

Moreover, recognition of a class-of-one theory in the execution protocol context would subject nearly every protocol revision and discretionary decision to equal protection review in federal court, regardless of whether the resulting change or decision impacted a capital prisoner's rights under the Eighth Amendment. *See Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10th Cir. 2004) (observing that, "unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors"); *see also Engquist*, 553 U.S. at 608-09 ("The Equal Protection Clause does not require [the] displacement of managerial discretion by judicial supervision.") (internal citation omitted).

For these reasons, the Court concludes that, absent the most extraordinary circumstances not present here, class-of-one claims do not lie in the execution protocol

---

[4]This is not to say that discretionary decisionmaking by ADC may never offend the Equal Protection Clause.  Equal protection would undoubtedly be implicated if prison officials made class-based decisions in the execution protocol context (i.e., treating distinct groups of individuals categorically different), or made decisions in the execution protocol context that intrude on the right to be free from cruel and unusual punishment.  However, under either of those scenarios, the class-of-one theory of equal protection would be unnecessary to pursue such a claim.

context.  However, even if the class-of-one equal protection theory applies, Plaintiffs have not demonstrated that the discretion afforded the ADC director by the January 2012 Protocol is irrational.

"[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (internal quotation omitted).  Accordingly, a classification that does not involve fundamental rights or proceed along suspect lines "is accorded a strong presumption of validity" and "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 319-20.  A classification must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id.* at 320 (internal quotation omitted).

Here, Plaintiffs assert in only a conclusory manner that there is no rational basis for vesting discretion in ADC's director to choose between a three-drug and one-drug protocol, to select the execution team members, and to choose between sodium thiopental or pentobarbital.  ADC has a legal obligation to carry out lawfully-imposed capital sentences and a legitimate interest in ensuring that executions are carried out in a reliable, humane, and professional manner.  This Court can discern no irrationality in the vesting of discretion in ADC's director to select the chemical protocol and execution team members for an individual execution.

As demonstrated in previous litigation, drug supply issues arise, and ADC may not always have a sufficient quantity of barbiturate (sodium thiopental or pentobarbital), pancuronium bromide, or potassium chloride on hand.  Plaintiffs assert drug availability is an illogical rationale given the fact both protocols require the same amount of barbiturate. (Doc. 30 at 10.)  However, ADC has not executed anyone using only an overdose of barbiturate, and the Ninth Circuit recently reiterated that a state "is free to choose to use the three-drug protocol" over the one-drug protocol so long as "it does so in a way that is not likely to cause substantial risk of serious pain." *Rhoades v. Reinke*, ___ F.3d ___, 2011 WL

5574900, at *5 (9th Cir. Nov. 16, 2011).  ADC has executed over twenty-five inmates using the three-drug protocol, which was designed in part to prevent "involuntary physical movements during unconsciousness" and to hasten death.  *Baze*, 553 U.S. at 57.  As the Court noted in *Baze*, a state "has an interest in preserving the dignity of the procedure, especially where convulsions or seizures could be misperceived as signs of consciousness or distress."  *Id.*;  *see also Workman v. Bredesen*, 486 F.3d 896, 909 (6th Cir. 2007) ("[P]ancuronium bromide . . . speeds the death process, prevents involuntary muscular movement that may interfere with the proper functioning of the IV equipment, and contributes to the dignity of the death process.") (internal citation omitted).  It is thus not irrational for the director to prefer the three-drug protocol and to determine prior to a scheduled execution which chemicals will be administered, based on their availability. Similarly, the selection of execution team members is clearly subject to fluctuation, based on the availability of such individuals to participate at a specific time.  This is especially true here given the fact an execution date is set by the Arizona Supreme Court only 35 to 60 days after the court decides to issue a warrant.  *See* Ariz. R. Crim. P. 31.17(c)(3).

For the foregoing reasons, the Court concludes that Plaintiffs have failed to establish a substantial likelihood of success on Claim One.

## C.   Administration of Three-Drug Protocol with Imported Pancuronium Bromide

According to the complaint, Director Ryan has notified Plaintiffs that ADC intends to execute them using the three-drug protocol and that the second drug, pancuronium bromide, was obtained from a foreign source.  In Claim Three, Plaintiffs allege that use of foreign-obtained pancuronium bromide will subject them to a risk of pain and suffering because foreign-sourced drugs do not have FDA approval.  Plaintiffs further allege their equal protection rights are violated by Director Ryan's "arbitrary decision to select a protocol and a drug that increases the risk of harm without any compelling or legitimate interest." (Doc. 8 at 23.)

Plaintiffs' Eighth Amendment allegations are speculative and conclusory.  In *Cook I*,

the Ninth Circuit affirmed summary dismissal of a complaint that alleged "foreign manufactured non-FDA approved drugs 'may not be effective,' 'could be contaminated or compromised,' and 'may be very different from FDA approved drugs with respect to formulation, potency, quality, and labeling.'" 637 F.3d at 1006. The court concluded that these allegations were "speculative and overly generalized claims applicable to every drug produced outside the United States" and that the plaintiff had failed to allege any facts showing that the foreign-manufactured drug was contaminated, compromised, or otherwise substandard. *Id.*

As in *Cook I*, Plaintiffs have failed to allege any specific facts suggesting that ADC's supply of pancuronium bromide is counterfeit or in any way deficient.[5] This is insufficient to state a claim for relief under the Eighth Amendment, let alone demonstrate a likelihood of success on the merits. Moreover, Arizona's protocol has adequate safeguards to ensure that pancuronium bromide is not administered until after the prisoner is fully anesthetized. *See Cook I*, 637 F.3d at 1007-08, *citing Dickens*, 631 F.3d at 1143 (describing consciousness checks). In addition, the five-gram dose of barbiturate administered as the first drug in Arizona's three-drug protocol is itself a lethal dose. *See Jackson v. Danberg*, 656 F.3d 157, 163 (3rd Cir. 2011) (observing that five grams of pentobarbital is lethal dose); *Nooner*, 594 F.3d at 607 (observing that two grams of sodium thiopental is "massive, and potentially lethal, dose"). Thus, even if ADC's supply of pancuronium bromide is in some way compromised, there is little risk Plaintiffs would experience serious pain from its administration.

The Court also finds that Petitioner has not demonstrated a substantial likelihood of

---

[5]In their motion for injunctive relief, Plaintiffs reference the Court's order in *West* stating that ADC had agreed not to use *any* imported drugs in an execution. (Doc. 19 at 7-8.) However, the "drugs" reference in that order was to ADC's supply of sodium thiopental, which Director Ryan explained in his deposition was not being used at the request of the Drug Enforcement Agency. Ryan did not make a similar assertion as to imported pancuronium bromide or potassium chloride, and the DEA did not request that ADC abstain from using either of those chemicals. (*See* Doc. 34-1 at 8.)

success on the merits of his equal protection claim.  As already discussed, the class-of-one theory of equal protection does not apply to discretionary decisionmaking within the execution protocol context.  However, even if it does, for the reasons set forth above, Plaintiffs have failed to demonstrate any actual injury or irrationality from Director Ryan's decision to administer the three-drug protocol.

**D.    Lack of Notice**

Plaintiffs allege in Claim Four that the January 2012 Protocol fails to provide sufficient notice of the drug or drugs that will be used during an execution and fails to provide any notice as to where ADC intends to site the IV lines to be used in an execution, in violation of their rights to notice and an opportunity to be heard under the Due Process Clause of the Fourteenth Amendment.

To establish a procedural due process violation, Plaintiffs must show that (1) they had a property or liberty interest that was interfered with by Defendants, and (2) Defendants failed to use constitutionally sufficient procedures in depriving Plaintiffs of that right. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989).  "[A]n individual claiming a protected interest must have a legitimate claim of entitlement to it.  Protected liberty interests 'may arise from two sources—the Due Process Clause itself and the laws of the States.'"  *Id.* (citing *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)).

Plaintiffs have not alleged that Arizona law creates an enforceable liberty interest.  As already noted, Arizona's lethal injection protocol is not statutory—it is issued by ADC and sets out technical procedures for carrying out executions.  Rather, Plaintiffs rely on a district court ruling in *Oken v. Sizer*, 321 F.Supp. 2d 658, 664 (D. Md.), *stay vacated*, 542 U.S. 916 (2004) (Mem.), in which the court stated:  "Fundamental fairness, if not due process, requires that the execution protocol that will regulate an inmate's death be forwarded to him in prompt and timely fashion."  However, there is no dispute that Plaintiffs have access to ADC's revised protocol.  The issue is whether Plaintiffs have a due process right to more than seven days' notice of intended administration of the one- or three-drug protocol or in any notice concerning intravenous access sites.  The Court concludes they do not.

In *Beaty*, the Ninth Circuit affirmed this Court's determination that the plaintiff had failed to show a likelihood of success on the merits of an alleged due process violation from the substitution of pentobarbital for sodium thiopental less than twenty-four hours before his scheduled execution. *Beaty*, 649 F.3d at 1072. In an opinion concurring in the denial of rehearing en banc, Judge Tallman observed:

> Though "the right to procedural due process is 'absolute,'" it is not unmeasured." *Carey v. Piphus*, 435 U.S. 247, 259, 266 (1978). "[I]n deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that 'procedural due process rules are shaped by the risk of error inherent in the truth-finding process . . . .'" *Id.* at 259 (quoting *Mathews v. Eldrige*, 424 U.S. 319, 344 (1976).
>
> Had Beaty raised a claim of significant merit, the "risk of error" would have risen and so, too, would the degree of process necessary to satisfy any constitutional concern. However, Beaty did not raise such a claim.

*Id.* at 1074; *see also Powell v. Thomas*, No. 2:11-CV-376-WKW, 2011 WL 1843616, at *10 (M.D. Ala. May 16, 2011) (finding no authority for proposition that condemned inmate has due process right to notice and opportunity to be heard regarding substitution of pentobarbital), *aff'd*, 641 F.3d 1255 (11th Cir.), *cert. denied*, 131 S. Ct. 2487 (2011). If notice of a drug substitution less than twenty-four hours before an execution failed to state a sufficiently meritorious due process claim warranting injunctive relief in *Beaty*, this Court concludes that Plaintiffs have failed to show any likelihood of success on the due process claims raised here.

First, Plaintiffs have not shown any credible risk that notice of the lethal chemical protocol only seven days prior to an execution may lead to cruel and unusual punishment. Plaintiffs do not dispute that a one-drug protocol is constitutional, acknowledging that "use of a barbiturate-only protocol would eliminate the risk of substantial pain that would occur if pancuronium bromide and potassium chloride were administered to an improperly anesthetized prisoner." (Doc. 8 at 8.) In addition, the Court has separately determined that there is no likelihood of success on Plaintiffs' claim that "significant departures" in the January 2012 Protocol create a substantial risk of serious harm from administration of the three-drug protocol. Although an inmate will not know which protocol will be applied until

at least a week before a scheduled execution, the details of both the one-drug and three-drug protocols are set forth in Department Order 710 and may be challenged at any time.  Indeed, Claim Two of the instant complaint alleges Arizona's revised three-drug protocol is facially invalid even though not all of the plaintiffs in this action are under warrant of execution and have not been notified by ADC which protocol will be used in their executions.

Second, Plaintiffs have not shown any credible risk that lack of notice regarding intravenous siting may lead to cruel and unusual punishment.  In *Baze*, the Court held that "a condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative."  553 U.S. at 51.  "To qualify, the alternative procedure must be feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain."  *Id.* at 52.  Plaintiffs do not allege any facts to support the inference that the risk of pain and suffering during a lethal injection execution changes substantially based on the siting of the intravenous access, and this Court has expressly rejected the claim that use of a femoral central line causes constitutionally unacceptable pain and suffering.  *See West*, 2011 WL 6724628, at *17-18.  Therefore, the Court finds no right to notice and an opportunity to be heard as to intended placement of IV lines before an execution.  *Cf. Clemons v. Crawford*, 585 F.3d 1119, 1129 n.9 (8th Cir. 2009) (noting lack of authority indicating due process right to probe into backgrounds of execution personnel).

Given the lack of authority and facts to support Plaintiffs' alleged procedural due process violations, the Court finds they have failed to establish a likelihood of success on the merits of these claims.

**E.      Access to Counsel and Courts**

The January 2012 Protocol precludes in-person legal visitation after 9:00 p.m. the day prior to a scheduled execution, instead permitting only telephonic contact with attorneys of record.  Plaintiffs allege such calls will take place in a holding cell where ADC officers will be present and thus there will be no opportunity for "privileged communication."  This restriction, Plaintiffs assert in Claim Five, violates their rights to meaningful access to counsel and the courts under the First, Fifth, Eighth, and Fourteenth Amendments.

Prisoners have a constitutional right of access to the courts that is "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977). However, this right "guarantees no particular methodology but rather the conferral of a capability—the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Lewis v. Casey*, 518 U.S. 343, 354 (1996). Consequently, an inmate who brings a § 1983 claim based on his right of access to the courts must be able to show that the infringing act somehow defeated his ability to pursue a legal claim. That is, a prisoner must show he suffered an "actual injury" as a result of the defendant's actions. *Id*. at 348-49. An "actual injury" is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *Id.* at 348. The right of access does not create "an abstract, freestanding right," but exists to vindicate other rights. *Id.* at 351.

Plaintiffs do not identify any specific legal claims that will be inhibited by the lack of in-person access to counsel in the hours prior to a scheduled execution. Rather, they speculate they will be unable to petition the courts for relief "if circumstances arise immediately prior" to their executions indicating either incompetency for execution or cruel and unusual punishment. However, Plaintiffs have not articulated how their ability to seek redress in the courts is affected by the presence of ADC personnel near Plaintiffs' holding cell. Plaintiffs further speculate they will be unable to communicate privately because of a possibility ADC personnel will overhear Plaintiffs' side of a phone conversation. But this speculation is highly improbable and insufficient to state a claim. Even eavesdropping by ADC officers would not establish an inability to pursue a legal claim in the courts.

The cases cited by Plaintiffs are distinguishable. In *Ching v. Lewis*, the Ninth Circuit held that a prisoner's right of access to the courts includes contact visitation with his counsel. 895 F.2d 608, 610 (9th Cir. 1990) (per curiam). However, the court subsequently held in *Casey v. Lewis,* 4 F.3d 1516, 1523 (9th Cir. 1993), that Arizona's regulation prohibiting high-risk inmates from having contact visits with their attorneys was a reasonable response to the legitimate concern with preventing escape, assault, hostage-taking, and smuggling

1   contraband.   And in *Cooey v. Strickland*, the plaintiffs had *no* access to telephonic
2   communication with counsel, confidential or otherwise. *See* No. 2:04-cv-1156, 2011 WL
3   320166, at *7-10 (S.D. Ohio Jan. 28, 2011) (unpublished order).   Here, ADC's protocol
4   provides for unlimited telephonic contact.

5          Defendants assert that after 9:00 p.m. the evening before a scheduled execution, the
6   prisoner is prepared to be moved from a cell at the Eyman prison complex to the housing unit
7   at the Florence prison complex where the execution takes place. (Doc. 28 at 11.)   According
8   to Defendants, staff members participating in various execution-related roles are present at
9   the Florence location and their identity is confidential. *See* Ariz. Rev. Stat. § 13-757(C)
10  ("The identity of executioners and other persons who participate or perform ancillary
11  functions in an execution and any information contained in records that would identify those
12  persons is confidential and is not subject to disclosure . . . .").   Although ADC has
13  historically permitted in-person visitation by counsel, this aspect of the protocol was changed
14  because "of increased concerns regarding the need to protect" the identities of persons
15  participating in the execution process. (Doc. 28 at 11.)   This concern does not reflect on any
16  particular lawyer.   Because ADC has a legitimate interest in maintaining confidentiality of
17  execution participants, the Court concludes that Plaintiffs have failed to show a substantial
18  likelihood of success on the merits of Claim Five.

19  **II.   Irreparable Harm, Balance of Equities, and Public Interest**

20         Although there is a likelihood of irreparable harm in every § 1983 action challenging
21  a proposed method of execution, that factor alone is insufficient to warrant injunctive relief
22  where there is no significant possibility of success on the merits.   In *Hill v. McDonough*, the
23  Court recognized the "important interest in the timely enforcement of a sentence" and
24  cautioned that federal courts "can and should protect States from dilatory or speculative
25  suits."   547 U.S. at 584-85.   Given the State's "strong interest in enforcing its criminal
26  judgments without undue interference from the federal courts," and because "the victims of
27  crime have an important interest in the timely enforcement of a sentence," the Court
28  concludes that the balance of equities favors Defendants and that a stay of execution to

resolve Plaintiffs' speculative allegations is not in the public interest. *Id.* at 584.

### CONCLUSION

Plaintiffs have not demonstrated entitlement to injunctive relief.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Emergency Motion for Temporary Restraining Order or Preliminary Injunction (Doc. 19) is **DENIED**.

DATED this 23rd day of February, 2012.

_____

Neil V. Wake
United States District Judge

- 29 -