Jon M. Sands
Federal Public Defender
Dale A. Baich, OH Bar No. 0025070
Robin C. Konrad, AL Bar No. 2194-N76K
Cary Sandman, AZ Bar No. 004779
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2816
dale_baich@fd.org
robin_konrad@fd.org
cary_sandman@fd.org

David J. Sepanik, CA Bar No. 221527
Flora F. Vigo, CA Bar No. 239643
Amanda R. Conley, CA Bar No. 281270
O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone: 415-984-8963
dsepanik@omm.com
fvigo@omm.com
aconley@omm.com

Counsel for Plaintiffs Rogovich, Stanley,
Cook, Stokley, and Hooper

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Towery, Robert Moormann, Pete Rovogich, Thomas Kemp, Samuel Lopez, Milo Stanley, Daniel Cook, Richard Stokley, and Murray Hooper, | Case No. 2:12-cv-00245-NVW |
| Plaintiffs, | **DEATH PENALTY CASE** |
| v. | **THIRD AMENDED COMPLAINT FOR EQUITABLE, INJUNCTIVE, AND DECLARATORY RELIEF [42 U.S.C. § 1983]** |
| Janice K. Brewer, Governor of Arizona; Charles L. Ryan, Director, Arizona Department of Corrections; Ron Credio, Warden, Arizona Department of Corrections - Eyman; Lance Hetmer Warden, Arizona Department of Corrections - Florence; Robert Patton, Division Director, Offender Operations, Arizona Department of Corrections; IV Team Leader; IV Team Members 1-5; Special Operations Team Leader; Special Operations Team Recorder; Special Operations Team Members 1-5; and Does 1-25, | |
| Defendants. | |

Plaintiffs, by undersigned counsel, allege as follows:

## NATURE OF THE ACTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 for violations and threatened violations by the Arizona Department of Corrections ("ADC") of Plaintiffs' right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, and for violations and threatened violations of Plaintiffs' rights to due process and to access to counsel and to the courts under the laws guaranteed by the First, Fifth, and Fourteenth Amendment to the United States Constitution.

2.      This Complaint does not challenge Plaintiffs' underlying capital convictions or sentences of death, nor does it allege that lethal injection as a form of execution is *per se* unconstitutional.  Rather, Plaintiffs challenge only the manner and means by which ADC intends to execute condemned prisoners by lethal injection under its protocol dated June 5, 2012.

3.      Plaintiffs seek equitable, injunctive, and declaratory relief.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights violations), § 2201 (declaratory relief), and § 2202 (injunctive relief).

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) because all Plaintiffs are currently incarcerated in Arizona State Prison Complex-Eyman, located within this District.  All executions performed by Defendants are carried out in Central Unit at Arizona State Prison Complex-Florence, also located within this District.  The wrongful acts giving rise to this Complaint have occurred and/or will occur in this District.

## THE PARTIES

6.      Plaintiffs are United States citizens and residents of the State of Arizona.  They are currently death-sentenced prisoners under the supervision of ADC.  They are incarcerated at ASPC-Eyman, Browning Unit, in Florence, Arizona.

7.      Plaintiff Pete Rovogich is a United States citizen and a resident of the State of

Arizona.  He is currently a death-row prisoner under the supervision of ADC.  He is held at the Arizona State Prison Complex-Eyman, 4374 East Butte Avenue, Florence, AZ, 85232.  Mr. Rogovich was sentenced to death on June 5, 1995, and therefore under Arizona Revised Statutes Section 13-757(B), he will be executed by lethal injection.

8.     Plaintiff Samuel Lopez is a United States citizen and a resident of the State of Arizona.  He is currently a death-row prisoner under the supervision of ADC.  He is held at the Arizona State Prison Complex-Eyman, 4374 East Butte Avenue, Florence, AZ, 85232.  Mr. Lopez  was sentenced to death on August 3, 1990, and therefore may choose under Arizona Revised Statutes Section 13-757(B) whether to be executed by lethal injection or lethal gas.  Mr. Lopez has yet to select a method of execution.  If he does not make a selection, Mr. Lopez will be executed by lethal injection.

9.     Plaintiff Milo Stanley is a United States citizen and a resident of the State of Arizona.  He is currently a death-row prisoner under the supervision of ADC.  He is held at the Arizona State Prison Complex-Eyman, 4374 East Butte Avenue, Florence, AZ, 85232.  Mr. Stanley was sentenced to death on September 25, 1987, and therefore may choose under Arizona Revised Statutes Section 13-757(B) whether to be executed by lethal injection or lethal gas.  Mr. Stanley has yet to select a method of execution.  If he does not make a selection, Mr. Stanley will be executed by lethal injection.

10.     Plaintiff Daniel Cook is a United States citizen and a resident of the State of Arizona.  He is currently a death-row prisoner under the supervision of ADC.  He is incarcerated at ASPC-Eyman, Browning Unit, 4374 East Butte Avenue, Florence, Arizona, 85232.  Mr. Cook was sentenced to death on August 8, 1988, and therefore may choose under Arizona Revised Statutes Section 13-757(B) whether to be executed by lethal injection or lethal gas.  If he does not make a selection, Mr. Cook will be executed by lethal injection.

11.     Plaintiff Richard Stokley is a United States citizen and a resident of the State of Arizona.  He is currently a death-row prisoner under the supervision of ADC.  He is incarcerated at ASPC-Eyman, Browning Unit, 4374 East Butte Avenue, Florence, Arizona,

85232. Mr. Stokley was sentenced to death on July14, 1992, and therefore may choose under Arizona Revised Statutes Section 13-757(B) whether to be executed by lethal injection or lethal gas.  If he does not make a selection, Mr. Stokley will be executed by lethal injection.

12.    Plaintiff Murray Hooper is a United States citizen and a resident of the State of Arizona.  He is currently a death-row prisoner under the supervision of ADC.  He is incarcerated at ASPC-Eyman, Browning Unit, 4374 East Butte Avenue, Florence, Arizona, 85232. Mr. Hooper was sentenced on February 11, 1983, and therefore may choose under Arizona Revised Statutes Section 13-757(B) whether to be executed by lethal injection or lethal gas.  If he does not make a selection, Mr. Hooper will be executed by lethal injection.

13.    Defendant Janice K. Brewer is the Governor of the State of Arizona and is being sued in her official capacity for equitable relief.

14.    Defendant Charles Ryan is the Director of ADC and is being sued in his official capacity for equitable relief.

15.    Defendant Ron Credio is the Warden of Arizona State Prison Complex-Eyman, where death-row prisoners are housed, and is being sued in his official capacity for equitable relief.

16.    Defendant Lance Hetmer is the Warden of Arizona State Prison Complex-Florence, where ADC performs all Arizona executions, and is being sued in his official capacity for equitable relief.

17.    Defendant Robert Patton is the Division Director for Offender Operations of ADC, and is being sued in his official capacity for equitable relief.

18.    Defendant IV Team Leader is the person assigned the role of IV Team Leader, as defined in Arizona Department of Corrections Order 710 and Attachment D, and is being sued in his or her official capacity for equitable relief.

19.    Defendants IV Team Members 1-5 are the persons assigned the role of IV Team member, as defined in Arizona Department of Corrections Order 710 and Attachment D, and are each being sued individually in his or her official capacity for equitable relief.

20.     Defendant Special Operations Team Leader is the person assigned the role of Special Operations Team Leader, as defined in Arizona Department of Corrections Order 710 and Attachment D, and is being sued in his or her official capacity for equitable relief.

21.     Defendant Special Operations Team Recorder is the person assigned the role of Special Operations Team Recorder, as defined in Arizona Department of Corrections Order 710 and Attachment D, and is being sued in his or her official capacity for equitable relief.

22.     Defendants Special Operations Team Members 1-5 are the persons assigned the role of Special Operations Team members, as defined in Arizona Department of Corrections Order 710 and Attachment D, and are each being sued individually in his or her official capacity for equitable relief.

23.     Defendants Does 1-25 are other unknown ADC officers, successors in office, agents, contractors, and employees, along with those acting in concert with them, who have participated or will participate in Plaintiffs' executions by virtue of their roles in designing, implementing, and/or carrying out the lethal-injection process.  These Defendants have participated or will participate in Plaintiffs' executions in various capacities, including in ordering, supplying, distributing, transporting, storing, or mixing lethal injection drugs; or preparing, implementing, or carrying out lethal injection itself.  The identities of these Defendants either have not yet been disclosed or have not been determined, but if and when Plaintiffs discover their identities, Plaintiffs will amend this Complaint accordingly.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

24.     Exhaustion is not necessary under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because this action does not challenge prison conditions, and because there are no available administrative remedies capable of addressing the challenged constitutional violations.  Prisoners in the past who have attempted to exhaust administrative remedies by challenging the constitutionality of ADC's lethal-injection protocol were informed in writing that their concerns were outside ADC's policy and that the issue was a

matter "for the judicial system."

25.    Attempting to exhaust available administrative remedies in an effort to resolve this issue would be futile because the internal grievance process does not allow for modification of the ADC lethal-injection protocol.  Moreover, because the ADC Director has unfettered discretion to change the protocol at anytime—even after providing notice as to certain aspects of the protocol—any attempt to grieve the protocol would be illusory.

<b>RELEVANT FACTS</b>

**A.    ADC Has Consistently Failed To Adhere to a Written Protocol**

26.    Plaintiffs are death-row prisoners awaiting execution in Arizona.   Under Arizona law, a sentence of death shall be carried out by lethal injection under the supervision of ADC.  Ariz. Rev. Stat. § 13-757(A).  But "[a] defendant who is sentenced to death for an offense committed before November 23, 1992 shall choose either lethal injection or lethal gas at least twenty days before the execution date.  If the defendant fails to choose either lethal injection or lethal gas, the penalty of death shall be inflicted by lethal injection."  Ariz. Rev. Stat. § 13-757(B).

27.    The statute does not provide any guidance to ADC; for example, the statute does not specify the drugs, dosages, drug combinations, or manner of intravenous line access to be used in the execution process.  Nor does the statute set forth requirements for the certification, training, or licensure required for those individuals who participate in the execution process.

28.    All of the details and methods involved in the execution process are to be determined at the sole discretion of ADC.  ADC promulgates a written protocol governing execution procedures in Arizona.  ADC Department Order 710 ("DO 710") establishes procedures for planning and carrying out executions.  Attachment D to DO 710 governs the preparation and administration of lethal drugs when carrying out an execution.

29.    ADC has executed eight prisoners since October 2010.  ADC has sought to execute two additional prisoners, but those prisoners each received a stay of execution.

30.     ADC has amended its written lethal-injection protocol eight times since October 2007.

31.     In at least three of the last five executions, ADC made last-minute changes to its execution procedures, demonstrating a recurring pattern of *ad hoc* changes to its lethal-injection procedures.

32.     Neither the statute nor DO 710 itself addresses any policy or procedure related to last-minute deviations from the written protocol.

33.     ADC has made representations to the Court in order to move forward with executions, but then failed to follow its own representations.

34.     Neither the statute nor DO 710 itself establishes standards for amending the protocol.

35.     ADC amended its protocol on October 3, 2007, and again on November 30, 2007; both amendments were made while there was a pending lawsuit challenging the constitutionality of ADC's execution procedures. *See Dickens v. Brewer*, Case No. 2:07-cv-1770-NVW (D. Ariz.) (Compl., Sept. 14, 2007, ECF No. 1).

36.     ADC then amended its protocol on September 15, 2009, to incorporate provisions that it agreed to include as part of the litigation in *Dickens*.

37.     ADC executed Jeffrey Landrigan and Eric King while its September 15, 2009, protocol was in effect.

38.     While prisoner Donald Beaty was under warrant and awaiting his execution scheduled for May 25, 2011, ADC issued a revised protocol on May 12, 2011.

39.     Eighteen hours before Beaty's scheduled execution, ADC gave notice that it would replace sodium thiopental, the first drug in its written three-drug protocol, with pentobarbital, a drug not listed or otherwise addressed in the protocol.

40.     On June 10, 2011, while Richard Bible and Thomas West were awaiting their executions scheduled for June 30, 2011, and July 19, 2011, respectively, ADC amended its protocol again.

41.     On July 16, 2011, several plaintiffs filed a lawsuit challenging the constitutionality of ADC's execution practices. *See West v. Brewer*, Case No. 2:11-cv-01409-NVW (D. Ariz.) (Compl. filed July 16, 2011).

42.     On September 12, 2011, while the *West* litigation was pending, ADC revised its protocol again.

43.     On December 21, 2011, the district court denied relief to plaintiffs. *West v. Brewer*, Case No. 2:11-cv-01409 (D. Ariz. Dec. 21, 2011) (ECF No. 112), *appeal docketed*, No. 12-15009 (9th Cir. Jan. 3, 2012), *and stay granted* (May 2, 2012).

44.     On January 10, 2012, the State's motions for warrants of executions were granted for Robert Moormann and Robert Towery, and the Arizona Supreme Court set execution dates for Moormann and Towery.

45.     ADC then revised its lethal-injection protocol on January 25, 2012 (hereinafter, the "January 2012 Protocol").

46.     Plaintiffs filed the instant lawsuit challenging the January 2012 Protocol as being unconstitutional on its face.

47.     ADC has executed three prisoners since the January 2012 Protocol was published.  Two of the three executions went forward not under the terms of the written protocol but rather under terms fashioned and approved by the Ninth Circuit based on representations by Defendants' attorney. *See Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012).

48.     Plaintiff Samuel Lopez was scheduled to be executed on May 16, 2012.  He challenged the constitutionality of Defendants' actions through a motion for preliminary injunction.  Although the Ninth Circuit denied relief, the execution procedure the court approved was not the written protocol, but rather the procedure Defendants' counsel represented would be followed during Lopez's  execution. *See Lopez v. Brewer*, No. 12-16084, 2012 WL 1693926 (9th Cir. May 15, 2012).

49.     The Arizona Supreme Court stayed Lopez's May 16, 2012 execution.  Lopez

is now scheduled to be executed on June 27, 2012.

50.     On June 5, 2012, ADC again amended its written protocol (hereinafter, the "June 2012 Protocol").

51.     The June 2012 Protocol, like the January 2012 Protocol, provides the ADC Director with unfettered discretion in determining the manner in which a prisoner will be executed. The critical change between the January 2012 Protocol and the June 2012 Protocol is that Defendants have removed the requirement that only a medical doctor place a central femoral line.

52.     The ADC Director can select entirely different manners of execution for otherwise similarly situated prisoners without offering any justification for the disparate treatment or adhering to any established standards for making such a determination. The determination is wholly arbitrary and lacks any guidelines, standards, or other rational bases for choosing between different procedures.

**B.     ADC Has Removed Important Protections From Its Current Protocol**

53.     The June 2012 Protocol allows for a condemned prisoner to be executed using either a three-drug or a one-drug protocol.

54.     If a three-drug protocol is used, executions will occur via administration of a sequence of three drugs—either sodium thiopental or pentobarbital, pancuronium bromide, and potassium chloride.

55.     If a prisoner is not properly anesthetized before being given the second and third drugs, he will suffocate and experience excruciating pain. *See Baze v. Rees*, 553 U.S. 35, 53 (2008) ("It is uncontested that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."); *see also Dickens v. Brewer*, 631 F.3d 1139, 1142 (9th Cir. 2011).

56.     The June 2012 Protocol contains significant departures from the previous version, which the Ninth Circuit determined to be constitutional on its face. *See Dickens*,

9

631 F.3d at 1150.

57.    The June 2012 Protocol removes several of the safeguards that the Supreme Court in *Baze* found necessary in assessing whether a lethal-injection protocol comports with the Eighth Amendment.

58.    The June 2012 Protocol eliminates the prisoner's ability to have attorney visits after 9:00 p.m. on the day before a scheduled execution.

59.    As a result, the June 2012 Protocol violates Plaintiffs' rights under the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

**(1)    In 2009, ADC Added Safeguards to its Lethal-Injection Protocol in Response to Litigation**

60.    In September 2007, several prisoners sentenced to death in Arizona brought an action for injunctive relief under 42 U.S.C. § 1983, alleging that Arizona's lethal-injection procedures violated the Eighth Amendment to the United States Constitution.  *Dickens v. Brewer*, Case No. 2:07-cv-1770-NVW (D. Ariz.) (Compl., Sept. 14, 2007, ECF No. 1).

61.    After discussions with the plaintiffs and in light of *Baze*, the *Dickens* defendants agreed to make substantial changes that were  designed to add crucial safeguards to the process, and to do so with the goal of decreasing the risk of harm to condemned prisoners.[1]  *Dickens v. Brewer*, 2009 WL 1904294, at *1 (D. Ariz. July 1, 2009).

62.    The defendants agreed that ADC would conduct medical license and criminal background checks on all medical team members prior to allowing them to participate in an execution, upon the issuance of a warrant of execution, and annually.  (*Dickens*, Joint Report, ECF No. 131 ("Joint Report") at 3:8-12, Ex. A § B ¶ 2; *see also Dickens*, 2009 WL 1904294, at *16.

63.    The defendants agreed that the members of the medical team would have "at least one year of current and relevant professional experience in their assigned duties on the

_____

[1]The defendants in *Dickens* are the same defendants as those in this matter, insofar as the defendants are described in their official capacities.  (That is, the individuals serving as state actors have changed, but the offices themselves are the same.)

Medical Team."  Joint Report at Ex. A § B ¶ 4; *see also Dickens*, 2009 WL 1904294, at *16.

64.     The use of a qualified and competent medical team increases the likelihood that medical aspects of the execution process will be performed correctly, including setting of IVs, preparation of drugs, monitoring consciousness, and administering the full dose of drugs into the prisoner's circulatory system, thus decreasing the unconstitutional risk of pain and suffering.

65.     The *Dickens* defendants agreed that instead of using a femoral central line, ADC would "by default" administer lethal drugs "through a peripheral intravenous line." Joint Report at Ex. A § F ¶ 1; *see also Dickens*, 2009 WL 1904294, at *16.

66.     Based upon ADC's representations that it would add the above-described safeguards to its lethal-injection protocol, the district court granted summary judgment to Defendants, finding that, "[a]s written, the Arizona Protocol does not subject inmates to a substantial risk of serious harm and does not violate the Eighth Amendment." *Dickens*, 2009 WL 1904294, at *25 (hereinafter referred to as the "*Dickens* Protocol").

67.     The Ninth Circuit upheld the district court's judgment. *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).

**(2)     The *West v. Brewer* Trial Revealed That ADC Has Not Followed the Safeguards That It Adopted To Obtain a Favorable Outcome in *Dickens***

68.     After ADC conducted four executions under the version of the written protocol found constitutional in *Dickens*, the *Dickens* plaintiffs, along with Thomas West,[2] filed a lawsuit based on the premise that ADC's failure to follow its protocol violated plaintiffs constitutional rights. *See West v. Brewer*, Case No. 2:11-cv-01409-NVW (D. Ariz., filed July 16, 2011), *appeal docketed*, Case No. 12-15009 (9th Cir. Jan. 3, 2012), *and stay granted* (May 2, 2012).

69.     It is undisputed that Defendants did not conduct background and license checks on the two medical team members who participated in the executions of Jeffrey Landrigan,

[2]Thomas West was executed on July 19, 2011.

11

Eric King, Donald Beaty, Richard Bible, and Thomas West, and who were responsible for inserting IV lines, preparing and mixing drugs, and monitoring the prisoner throughout the execution.

70.    It is undisputed that the two medical team members did not have one year of current experience in placing central femoral or peripheral IV lines.

71.    It is undisputed that in the last five executions, a central femoral line was placed.  In four executions, the central line was the primary line used to deliver the lethal drugs.

72.    It is undisputed that one of the medical team members had not placed an IV line in fifteen years and that he had a criminal record.

73.    It is undisputed that the medical team leader, who determined whether the prisoner was unconscious after the first drug was administered, would not be able to tell by using his methods for determining consciousness whether the prisoner was unconscious or paralyzed.

74.    Although the district court expressed reservations about deviations between the written protocol and its application, the court ultimately found that none of the  deviations viewed in isolation violated the Eighth Amendment.  *West v. Brewer*, Case No. 2:11-cv-01409 (D. Ariz. Dec. 21, 2011) (ECF No. 112).

75.    The district court's decision is currently on appeal in the Ninth Circuit.  *West v. Brewer*, Case No. 12-15009 (9th Cir. Jan. 3, 2012).

**(3)    ADC Subsequently Adopted a Protocol that Eliminates Safeguards, Increases the Director's Discretion, and Codifies Arbitrary and Disparate Treatment**

76.    ADC issued a revised protocol on January 25, 2012. This protocol eliminated most of the crucial safeguards that Defendants previously included in the execution protocol to obtain a favorable summary judgment ruling in *Dickens*.

77.    ADC then issued a revised protocol on June 5, 2012, which is similar to the January 2012 Protocol, except that it removes the length of experience required by the

previous protocol for the IV team members, and it removes the requirement that a medical doctor place a central femoral line.

78.     The June 2012 Protocol instructs that a Special Operations Team and an IV Team will carry out an execution.  There is no longer a Medical Team.

79.     Members of the IV Team are not subject to the same training, selection, and preparation criteria required of the Medical Team under the previous protocol.

80.     Under the June 2012 Protocol, the IV Team members are required to be "currently certified or licensed within the United States to place IV lines."  (DO 710.02, § 1.2.5.1.)  The June 2012 Protocol removes the requirement from the January 2012 Protocol that IV Team members "have at least one year of relevant experience."

81.     The IV Team members—the qualifications of whom are less stringent than those previously required for the Medical Team members—are responsible for inserting either peripheral IV catheters or a central femoral line, and for ensuring that all lines are functioning properly throughout the procedure.  The IV Team members are assigned to supervise the Special Operations Team in mixing and preparing drugs and monitoring the level of consciousness.[3]

82.     Under the June 2012 Protocol, unlike the *Dickens* Protocol, the IV Team members are not required to undergo a personal interview before being selected to participate in an execution.

83.     ADC removed a requirement that execution team members participate in ongoing training activities.  Under the June 2012 protocol, IV Team members no longer have to participate in at least ten training sessions per year.  IV Team members are only required to participate in "the training sessions scheduled for one day prior to the actual execution." (DO 710.02, § 1.2.5.5.)

84.     The decrease in training requirements increases the chance that IV Team

_____

[3] The Medical Team was responsible for mixing the drugs, preparing the syringes, and monitoring the prisoner under the previous protocol.  Now the Special Operations team performs these tasks under the supervision of the IV Team.  (DO 710.02, § 1.2.5.4.)

Members will be unprepared to properly carry out executions and unable to detect and correct problems that arise during the process, thus subjecting the prisoner to an increased risk of harm.

85.     The June 2012 Protocol vests substantial authority in the IV Team Leader.  The IV Team Leader's responsibilities include (1) advising the ADC Director as to where to place the primary and backup IV lines for each prisoner; (2) supervising the Special Operations Team in mixing the chemicals;[4] (3) monitoring the prisoner's level of consciousness;[5] and (4) attaching the leads from the electrocardiograph and checking the electrocardiograph's function.  (DO 710.02, § 1.2.4.4; DO 710 Attach. D, §§ B, ¶ 1; D, ¶¶ 7, 9; and E, ¶ 1.)

86.     The requirements listed in the June 2012 protocol for IV Team members do not include experience or competence in consciousness monitoring.

87.     The Special Operations Team, which consists of a minimum of five team members, including a Team Leader, a Recorder, and three additional team members, prepares the designated drug(s) and syringes for a total of one complete set of drugs.  (DO 710.02, § 1.2.4.1; DO 710 Attach. D, § B, ¶ 2.)

88.     The June 2012 Protocol does not set forth any requirements for the individuals serving on the Special Operations Team.

89.     The Division Director for Offender Operations selects the Special Operations Team members and team leader. (DO 710.02, § 1.2.4.2.)

90.     There is no requirement that the Special Operations Team members have any

---

[4] This section of Attachment D is inconsistent with DO 710.02 § 1.2.5.4, which states that the IV Team, not the IV Team Leader, shall "supervise the Special Operations team in the mixing of the chemicals."

[5] This section of Attachment D is inconsistent with DO 710.02 § 1.2.5.4, which states that the IV Team shall "supervise the Special Operations team in . . . monitoring the inmate (including the level of consciousness and establishing the time of death)."  Whether the IV Team Leader is responsible for personally monitoring the level of consciousness or supervising others, it still requires expertise that is not indicated in the protocol. Demonstrating further inconsistency, DO 710, Attach. D, ¶ 9, states both that "the IV Team members shall continually monitor the inmate's level of consciousness" and that "[t]he IV Team Leader shall be responsible for monitoring the inmate's level of consciousness."

minimum qualifications, including experience mixing or preparing drugs.  This increases the risk that the prisoner will receive the wrong drug, will receive the drugs in the wrong order, or will receive improperly mixed drugs, any of which causes substantial pain and suffering, including awareness of death by suffocation.

91.     Under the June 2012 Protocol, the ADC Director has sole discretion to determine "which [drug] protocol will be used for the scheduled execution." (DO 710 Attach. D, § C ¶1.)  There are four options from which the ADC Director can choose.

92.     Option A is a three-drug protocol, which includes: four (4) syringes of 1.25 grams of sodium thiopental; two (2) syringes of 60 milligrams of pancuronium bromide; and two (2) syringes of 120 milliequivalents of potassium chloride.

93.     Option B is a three-drug protocol, which includes: two (2) syringes of 2.5 grams of pentobarbital; two (2) syringes of 60 milligrams of pancuronium bromide; and two (2) syringes of 120 milliequivalents of potassium chloride.

94.     Option C is a one-drug protocol, which includes: four (4) syringes of 1.25 grams of sodium thiopental.

95.     Option D is a one-drug protocol, which includes: two (2) syringes of 2.5 grams of pentobarbital.

96.     The June 2012 Protocol calls upon the ADC Director to inform the prisoner in writing, seven days prior to the scheduled execution date, which combination of drugs will be used in his or her execution.  (DO 710 Attach. D, § C ¶1.)

97.     The June 2012 Protocol does not provide any guidance or rationale for selecting one option over another, nor does it specify how the ADC Director will make the decision.

98.     The June 2012 Protocol eliminates from the *Dickens* Protocol the peripheral catheter as the default method.  Instead, the ADC Director determines at no specified time whether to use peripheral or central femoral IV access.

99.     Peripheral IV access is safer as a default method of IV access because it does

not involve the larger, deeper vein accessed in a central line placement. Peripheral IV access is not an invasive surgical procedure.

100.   Placement of a central femoral line is an invasive, complicated surgical procedure that requires specialized training and experience.

101.   Placement of a central femoral line should only be used when medically indicated and by medical personnel with extensive training in this specific procedure.

102.   Central femoral line placement can cause great pain, as it requires placing the IV in a vein which can be anywhere from half an inch to several inches below the skin, and it can cause painful and dangerous complications.

103.   The June 2012 Protocol no longer requires that the individual placing a central femoral line be a medical doctor.

104.   The June 2012 Protocol does not limit the time or attempts to place an IV catheter.

105.   A time limitation in setting IV lines is a necessary safeguard. Multiple attempts to place an IV threatens the integrity of the prisoner's veins and increases the chance that even if a line is set, it will fail.

106.   The  June 2012 Protocol also removes from the *Dickens* Protocol the pre-execution assessment of the prisoner's veins that was in the prior version of the protocol.  A venous assessment is a necessary safeguard to ensure, *inter alia*, proper placement of catheters.

107.   The June 2012 Protocol eliminates the preparation of a backup set of drugs.

108.   Under a three-drug protocol, the preparation of a backup set of drugs is a necessary safeguard to ensure that a sufficient dose of the first drug (the barbiturate) is successfully administered.  If there are problems in administering any of the three drugs, there is a substantial risk that the prisoner will suffer harm, and it would be imperative that an additional dose of the first drug be administered immediately.

109.   The June 2012  Protocol is unclear and contradictory on the question of

16

1    whether a back-up catheter is required.

2        110.   One section of the June 2012 Protocol indicates that the "IV Team shall insert

3    a primary IV catheter and a backup IV catheter." (DO 710 Attach D, § E, ¶ 1.)

4        111.   The same section of the protocol states that the ADC Director will determine

5    the "catheter(s) site(s)" (DO 710 Attach D, § E, ¶ 1), suggesting that a single catheter site

6    will be used.

7        112.   The June 2012 Protocol instructs that "[t]he IV Team shall be responsible for

8    inserting *either* peripheral IV catheters *or* a central femoral line as determined by the

9    Director acting upon the recommendation of the IV Team Leader."  (DO 710.02, § 1.2.5.4)

10   (emphasis added).  The language here suggests that there would either be two peripheral

11   catheters or one central line.

12       113.   Under a three-drug protocol, the preparation of a backup IV line is a necessary

13   safeguard to ensure that a sufficient dose of the barbiturate is administered.  If there are

14   problems in administering any of the three drugs, there is a substantial risk that the prisoner

15   will suffer harm, and it would be imperative that an additional dose of the first drug be

16   administered immediately.

17       114.   The June 2012 Protocol does not inform prisoners of how or when the ADC

18   Director will make the determination of which IV line(s) will be established.

19       115.   The ADC Director does not provide notice to the condemned prisoner whether

20   femoral or peripheral IV access will be used.

21       **(4)    ADC's Practices as Written and Applied Circumvent Judicial
22              Scrutiny of its Protocol**

23       116.   The June 2012 Protocol does not require that ADC keep detailed records of

24   pre-execution and execution proceedings.   The protocol states only that the Special

25   Operations Team Recorder "shall document on the [Correctional Service Log] the amount

26   of each chemical administered and "confirm" that it was administered in the order set forth

27   in the Chemical Chart [as well as] the start and end times of each of the three phases of the

28   administration of the chemicals."  (DO 710, Attach. D, §§ C, ¶ 8; F, ¶ 15.) The June 2012

Protocol does not indicate what shall be documented if the drugs are not administered in accordance with the Chemical Chart.  There is nothing to indicate that the preprinted amounts of drugs on the logs are verified by the Recorder.

117.    The June 2012 Protocol does not require the Special Operations Team Recorder or any other participant to record evidence of difficulties with any part of the process; nor does the protocol require the recording of execution-team responses to those difficulties.  The June 2012 Protocol does not require any information to be recorded regarding the insertion of the IV lines.

118.    In practice, ADC does not keep detailed logs of pre-execution and execution proceedings.

119.    Only one execution log from the past eight executions—that from Thomas West's execution—included information as to why the IV lines could not be placed in certain locations.

120.    This information was recorded based on the concerns expressed by a three-judge panel of the Ninth Circuit the day before West's execution.  *West v. Brewer*, 652 F.3d 1060, 1061 (9th Cir. 2011) ("Moreover, [Defendants' attorney] represented that the protocol will be followed regarding the locations and order of preference for insertion sites as detailed in Paragraph G of the protocol."); *West v. Brewer*, No. 11-16707, Oral Argument of Assistant Attorney General Jonathan Bass (July 18, 2011) at 29:51, *available at* http://www.ca9.uscourts.gov/media (Judge Wardlaw indicating that the Protocol says it is "mandatory to start with peripheral"); *id.* at 27:20-33 (Judge Wardlaw telling the Assistant Attorney General, "You're not giving at least me any confidence that in fact the medical team leader is actually making a determination that peripheral won't work before he goes to the femoral, which is required by the protocol.").

121.    Defendants have a history of misrepresenting their execution procedures.  *See, e.g.*, *West v. Brewer*, 2011 WL 6724628, at *11 (D. Ariz. Dec. 21, 2011) ("Defendants told this Court and the Court of Appeals that they would follow the protocol 'as written.'  And

they did not.").

122.   On the eve of Moormann's February 2012, and Towery's March 2012, executions, the Ninth Circuit made clear that ADC's last-minute alterations to its protocol were unacceptable and could not continue. *Towery v. Brewer*, 672 F.3d 650, 653 (9th Cir. 2012).

123.   The court admonished ADC that "[u]nless permanent changes are made in the manner in which Arizona amends its protocols, Arizona's conduct may require [the court] to monitor every execution on an *ad hoc* basis, because the State cannot be trusted to fulfill its otherwise lawful duty to execute inmates sentenced to death." *Id.* at 653 (quotations omitted).

124.   Because ADC continued to engage in the exact type of last-minute amendments and *ad hoc* alterations to its execution protocols in the executions that followed, seven judges on the Ninth Circuit expressed further concern in May 2012. *See, e.g.*, *Lopez v. Brewer*, No. 12-16084, 2012 WL 1760700, at *9 (9th Cir. May 18, 2012) (Pregerson, J., dissenting from denial of rehearing en banc) ("The state of Arizona continues to ignore this court's frequent requests to adopt a clear protocol stating the procedures it follows when executing its citizens."); *id.* at *10 (Reinhart, J., dissenting from denial of rehearing en banc) ("The state either has not heard the message or has ignored it. It's hard to believe that it could be the former."); *see also id.* ("[T]he state of Arizona has subjected prisoners whose lives it takes—and has subjected this Court—to a mockery of the constitutional requirement of due process.").

125.   As Judge Berzon observed in her accompanying opinion to the *Lopez* decision, ADC's constant changes in its protocol have created a situation in which those "facing execution in the future[] are not presented with any written, binding protocol such as the ones in *Baze* and in *Dickens* on which to focus in determining whether their impending execution will meet constitutional standards." *Id.* at *10 (Berzon, J., concurring in part and dissenting in part).

126.    Despite these warnings that ADC's revolving door of execution protocols was creating a constitutionally untenable situation under which prisoners facing execution have no meaningful way to properly challenge the execution procedures to which they will be subject, ADC once again amended its execution protocol twenty-two days before a scheduled execution.

127.    Defendants continue to make *ad hoc* changes to their procedures but do not amend their written protocol to reflect these changes.

**E.    Executions of Robert Moormann, Robert Towery, and Thomas Kemp**

128.    On January 10, 2012, the Arizona Supreme Court issued warrants of execution for Robert Moormann and Robert Towery.  Robert Moormann's execution was scheduled for February 29, 2012.  Robert Towery's execution was scheduled for March 8, 2012.

129.    After the warrants were issued, Towery and Moormann, through counsel, asked Director Ryan to provide them with information regarding the process by which they would be executed, including qualifications of the team members, which drugs would be administered, and where the IV lines would be set.

130.    On February 2, 2012, counsel for Towery and Moormann received letters from the Attorney General advising, as a courtesy, that Director Ryan had made the decision to use the three-drug protocol in each of the executions.  The letter did not indicate whether the first drug used would be sodium thiopental or pentobarbital.

131.    In that same letter dated February 2, 2012, the Attorney General also advised counsel for Towery and Moormann that Director Ryan also decided to use the pancuronium bromide imported from in Great Britain in 2011, in carrying out each of their executions.

132.    The pancuronium bromide was imported from Dream Pharma, Ltd., a grey-market distributor, and is not approved for importation into or use in the United States for any purpose.  *See Beaty v. FDA*, No. 1:11-cv-00289-RJL, 2012 WL 1021048, at *8-*9 (D.D.C. Mar. 27, 2012).

133.    On February 3, 2012, Towery and Moormann received letters from Director

Ryan informing them that ADC would not release any information regarding the qualifications of the IV Team. Director Ryan again informed Towery and Moormann that ADC planned to use imported pancuronium bromide in the each of their executions.

134. On February 27, 2012, Director Ryan informed Moormann and Towery that ADC would use a one-drug protocol in carrying out their executions because it had just discovered that day that its entire supply of pancuronium bromide was expired.

135. Under the January 2012 Protocol, upon receipt of the execution warrant, the Housing Unit 9 team leader is to "[e]nsure that complete sets of chemicals are on site and immediately available for use." (DO 710 Attach. D, § A.) Defendants failed to do this.

136. Robert Moormann was executed on February 29, 2012. His execution was scheduled to begin at 10:00 a.m.

137. Moormann's attorneys visited with him until 9:15 a.m. on February 29, 2012.

138. At 9:30 a.m., Moormann had been strip-searched and was placed in upper restraints.

139. At 9:50 a.m., Moormann was secured to the execution table.

140. At 9:55 a.m., the Director determined the catheter(s) site(s).

141. At 10:05 a.m., the Housing Unit 9 Section Leader advised the Director that the IV procedure was complete.

142. Moormann had two IV catheters placed, one in each of his arms near his elbows. The left peripheral catheter was designated as the primary IV line. The right peripheral catheter was designated as the back-up IV line.

143. At 10:23 a.m., Moormann made his last statement.

144. At 10:28 a.m., the Housing Unit 9 Section Leader advised the witnesses that Moormann had been sedated.

145. At 10:33 a.m., Moormann was pronounced dead.

146. Robert Towery was executed on March 8, 2012. His execution was scheduled to begin at 10:00 a.m.

21

147.    Towery's  attorneys visited with him until 9:15 a.m. on March 8, 2012.

148.    At 9:30 a.m., Towery had been strip-searched and was placed in upper restraints.

149.    At 9:35 a.m., Towery asked the Director what the protocol was and where the drugs had been obtained.

150.    At 9:49 a.m., Towery was secured to the execution table.

151.    At 9:52 a.m., the Director determined the catheter(s) site(s).

152.    At 10:28 a.m., after multiple attempts of the left and right peripheral (approximately four in the right and two in the left), the IV Team Leader recommended the right femoral catheter as the primary IV line and the left peripheral catheter as the back-up IV line.

153.    At 10:31 a.m., the Director called the Attorney General's office and provided an update regarding the IV process.

154.    At 10:37 a.m., the Director spoke with Jeff Zick at the Attorney General's office.

155.    At some point during the attempts to set the IV lines, Towery asked to speak with his counsel, Dale Baich, but he was not permitted to do so.

156.    At approximately 10:45 a.m., Towery's execution had not yet started. Towery's counsel, Dale Baich, asked an ADC employee if there was anything that he needed to know regarding Towery or the execution procedure.  The ADC employee checked with the command center and informed Baich that command had nothing to report.

157.    At 10:50 a.m., the right femoral catheter was placed; the left peripheral catheter was unsuccessful.  The Director had a discussion with the IV Team Leader regarding the back-up IV line.

158.    At 10:59 a.m., a catheter was placed right in Towery's right hand.

159.    The right femoral catheter was designated as the primary IV.  The right hand catheter was designated as the back-up IV.

22

160.    At 10:59 a.m., the Housing Unit 9 Section Leader advised the Director that the IV procedure was complete.

161.    At 11:17 a.m., Towery made his last statement. During that statement, via a "code" system designed by Towery and his attorney, Towery indicated that he was denied access to counsel. Towery also indicated that mistakes were made or that he was harmed during the insertion of the IV lines.

162.    At 11:22 a.m., the Housing Unit 9 Section Leader advised the witnesses that Towery had been sedated.

163.    At 11:26 a.m., Towery was pronounced dead.

164.    The doctor who ADC hired to conduct its executions in 2010-2011 informed ADC that it would be painful to administer a large amount of barbiturate through a small peripheral vein in the distal portion of an extremity.

165.    An autopsy of Towery revealed that his peripheral veins of the antecubital fossae were thin-walled and pliable without signs of sclerosis.

166.    On March 20, 2012, the Arizona Supreme Court issued warrants of execution for Thomas Kemp and Samuel Lopez. Thomas Kemp's execution was scheduled for April 25, 2012. Samuel Lopez's execution was scheduled for May 16, 2012.

167.    ADC notified the Arizona Supreme Court that Kemp's execution and Lopez's execution would take place at 10:00 a.m.

168.    Via letter dated March 22, 2012, Director Ryan informed counsel for Thomas Kemp that no more than two legal visitors would be permitted to see Kemp and that they would only be permitted a one-hour visit from 6:00 a.m. until 7:00 a.m.

169.    When Director Ryan was asked about the possibility of a visit consistent with the Ninth Circuit's order in *Towery v. Brewer*, he said the Court "incorrectly relied" on an older protocol and that he would allow Kemp to have attorney visitation on the morning of his execution from 6:00 a.m. until 7:00 a.m.

170.    Director Ryan informed Kemp that ADC intended to carry out his execution

23

using a one-drug protocol with pentobarbital, and stated that back-up chemicals would not be prepared in syringes unless they were required.

171.    Thomas Kemp was executed on April 25, 2012.  His execution was scheduled to begin at 10:00 a.m.

172.    Kemp's attorneys visited with him from 6:00 a.m. until 7:00 a.m., on the morning of April 25, 2012.

173.    Before Kemp's execution started, his attorney Tim Gabrielsen, along with other witnesses, was informed by an ADC employee that Kemp would be sedated and that after ADC personnel verified that he was sedated, the lethal drugs would be injected.  Gabrielsen raised the concern with an ADC employee that Kemp was going to be injected with drugs after he was sedated, because a sedation check followed by injection of lethal drugs is required only with the three-drug protocol.  The ADC employee did not answer his question.  Eventually, another ADC official told Gabrielsen that Kemp would be executed using a one-drug protocol.

174.    ADC encountered a problem setting up the EKG for Kemp.

175.    At 9:06 a.m., Kemp had been strip-searched and was placed in upper restraints.

176.    At 9:18 a.m., Kemp was secured to the execution table.

177.    At 9:20 a.m., the Director determined the catheter(s) site(s).

178.    At 9:46 a.m., the Housing Unit 9 Section Leader advised the Director that the IV procedure was complete.

179.    Kemp had two IV catheters placed, one was placed in the right femoral and the other was placed in the "left A/C."[6]  The femoral catheter was designated as the primary IV line.  The "left A/C" catheter was designated as the back-up IV line.

180.    At 10:01 a.m., Kemp made his last statement.  During Kemp's final statement, his attorney heard him say "I regret nothing" and heard nothing else.  Kemp's lips appeared

---

[6]The ADC logs from Thomas Kemp's execution (which Plaintiffs received on June 18, 2012) do not indicate the meaning of the abbreviation A/C.

24

to continue moving, despite the witnesses not being able to hear him say anything else.

181.    ADC has informed prisoners, including Robert Towery and Richard Bible, that the microphone would be turned off if they made statements against ADC.

182.    After the drugs were injected, Kemp's right arm and his torso began violently shaking. This occurred for approximately five or six seconds. This could have been a partial seizure potentially caused by the administration of pentobarbital.

183.    At 10:06 a.m., the Housing Unit 9 Section Leader advised the witnesses that Kemp had been sedated.

184.    At 10:08 a.m., Kemp was pronounced dead.

185.    The IV line attached to the catheter in Kemp's left arm had a knot in it.

186.    An autopsy performed on Kemp revealed that at least one puncture was made in the femoral area.  The autopsy also revealed that there were at least two punctures in the left arm:  one in the antecubital fossa and one in the outer forearm.  There were no puncture marks anywhere on Kemp's right arm.

187.    An autopsy revealed that Kemp had good veins that were quite prominent, without visible thickening, scarring, or sclerosis.  The autopsy revealed no visible signs of stroke, bleeding, or other significant findings in the brain tissue.

**F.    Scheduled Executions of Samuel Lopez and Daniel Cook**

188.    On May 15, 2012, the Arizona Supreme Court issued a stay of execution for Samuel Lopez.  The Court subsequently rescheduled Lopez's execution for June 27, 2012.

189.    Under DO 710, a prisoner will be transferred to death watch thirty-five days before his scheduled execution.  Lopez spent thirty-four days on death watch before his execution was stayed.  On May 17, 2012, Lopez asked Director Ryan to exercise his discretion and not transfer Lopez back on death watch until one week before his new execution date.  Director Ryan declined his request.

190.    On June 5, 2012, Director Ryan informed Lopez that ADC would carry out Lopez's execution using a one-drug protocol with pentobarbital.  Director Ryan informed

Lopez that he would allow attorney-client visitation from 6:00 a.m. until 9:00 a.m. on the morning of his execution as ordered by the Ninth Circuit.  Director Ryan also informed Lopez that Lopez could choose to make a final statement and the microphone would remain on unless Lopez used vulgar language or made "intentionally offensive" statements. Director Ryan indicated that the witnesses to Lopez's execution would be permitted to view the placement of the IV catheters.

191.    Director Ryan has not indicated that attorney-client visitation from 6:00 a.m. until 9:00 a.m. on the morning of an execution will apply to future executions.

192.    Director Ryan has not indicated that his discretionary *ad hoc* decision to permit counsel to witness Lopez's execution will apply to future executions.

193.    Although ADC avowed to the Ninth Circuit that a nurse and a doctor would be the IV Team for Lopez's execution, on June 7, 2012, ADC informed Lopez that the nurse has been replaced with an individual who is currently certified or licensed to place IV lines. No other information has been provided regarding that individual.

194.    On June 12, 2012, the Arizona Supreme Court issued a warrant of execution for Daniel Cook.  His execution is scheduled for August 8, 2012.

## FIRST CLAIM FOR RELIEF

**The June 2012 Protocol Lacks the Necessary Safeguards Required under *Baze v. Rees* (8th Amendment; 42 U.S.C. § 1983)**

195.    Plaintiffs incorporate by reference each and every statement and allegation set forth in this Complaint as if fully set forth herein.

196.    In *Baze v. Rees*, the United States Supreme Court held Kentucky's lethal-injection protocol constitutional because it had necessary safeguards that reduced the substantial risk of a prisoner suffering during the implementation of the three-drug protocol. 553 U.S. 35 (2008).

197.    The Ninth Circuit upheld the written protocol that ADC devised to obtain a summary judgment ruling in the *Dickens* litigation, because it contained safeguards that were "substantially similar" to the Kentucky protocol that the Supreme Court upheld in *Baze*.  *See*

*Dickens v. Brewer*, 631 F.3d 1139, 1146 (9th Cir. 2009).  The Ninth Circuit affirmed the district court's decision "[b]ecause the protocol's safeguards are adequate under the *Baze* standard and because there is no material issue of fact regarding compliance with the protocol." *Id.* at 1141.

198.    The June 2012 Protocol eliminates many safeguards that ADC adopted in *Dickens*.  The few remaining safeguards fall substantially short of maintaining the "important safeguards" that the Supreme Court found acceptable in *Baze* and that the Ninth Circuit relied on in upholding the *Dickens* protocol.

199.    In *Baze*, the Supreme Court found that the most significant safeguard in the Kentucky protocol was the requirement that each member of the IV team had at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman.  *Baze*, 553 U.S. at 55.  Of note, Kentucky uses a phlebotomist and an EMT who have daily experience setting IV catheters.  *Id.*

200.    The Supreme Court noted that IV team members, along with the rest of the execution team, participated in at least ten practice sessions per year.  *Id.*  These training sessions involved a rehearsal of the execution process, including setting IV lines on volunteers.  *Id.*

201.    The Supreme Court found that the use of a primary and backup IV line ensures that if a prisoner does not receive a sufficient dose of the anesthetic through the primary line, he would be able to receive additional drugs through the backup line.  *Id.*  Consistent with using a backup line, the Court also noted that Kentucky requires that two sets of the lethal-injection drugs be prepared before the execution begins.  *Id.*

202.    The Supreme Court determined that Kentucky's one-hour time limit to establish an IV was not excessive.  *Id.* at 55.

203.    Unlike the protocol approved in *Baze* and in *Dickens*, the June 2012 Protocol does not require that the IV Team members have at least one year of experience.

204.    The June 2012 Protocol only requires that the IV Team attend one training

27

session on the day prior to an execution.  Unlike the protocol approved in *Baze*, the January 2012 Protocol provides no description of what shall be done at the sole training other than having "one training session with multiple scenarios."  (DO 710.02 § 1.1.2.)  Unlike the protocol approved in *Baze*, there is no requirement that the IV Team practice siting IVs during the training.

205.    Unlike the protocol approved in *Baze*, the June 2012 Protocol has no time limitation for the IV Team to find and set the IV catheters.  "Punishments are cruel when they involve torture or a lingering death."   *In re Kemmler*, 136 U.S. 436, 447 (1890).  Without a time restriction for setting an IV line, and without proper experience and training of the IV Team, the June 2012 Protocol increases the risk that Plaintiffs will suffer a lingering death.

206.    During Towery's execution, at least six unsuccessful attempts were made to insert IV catheters in his arms.  It took more than an hour to finally place an IV catheter in his right hand.

207.    Unlike the protocol approved in *Baze* and in *Dickens*, the June 2012 Protocol does not require the use of a primary and backup line.  A backup line is a necessary safeguard to help ensure that a complete dose of barbiturate is delivered to the prisoner in a three-drug protocol.

208.    There was a knot in the backup line used in Kemp's execution.  If it were necessary to use the backup line, the line would not have been effective.

209.    Unlike the protocol approved in *Baze* and in *Dickens*, the June 2012 Protocol does not require preparation of a backup set of drugs.  The relevant section of the protocol states, "The assigned Special Operations Team members shall prepare their designated chemical and syringes for a total of *one* complete set of chemicals. One full set of syringes is used in the implementation of the death sentence and one full set is to be available." (DO 710 Attach. D, § B, ¶ 2 (emphasis added).) This language suggests that one set of *syringes* is to be available, but does not require that the team prepare a backup set of *chemicals*. In practice, ADC did not prepare a backup set of drugs during the execution Kemp, and ADC

has provided notice that it will not prepare a backup set of drugs during the execution of Lopez.

210.    By eliminating these necessary safeguards, Defendants have stripped Arizona's lethal-injection process of the constitutional protections outlined in *Baze*.

211.    The June 2012 Protocol no longer has constitutionally adequate protections to ensure that a prisoner will not suffer from the second and third drugs in a three-drug protocol. There is an objectively intolerable risk that Plaintiffs' Eighth Amendment rights will be violated under the June 2012 Protocol.

### SECOND CLAIM FOR RELIEF

**Defendants' Execution Practices and Procedures Effectively Deny Plaintiffs Their Due-Process Rights (8th & 14th Amendments; 42 U.S.C. § 1983)**

212.    Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Complaint as if fully set forth herein.

213.    The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV.

214.    "The fundamental requisite of due process of law is the opportunity to be heard. This right to be heard has little reality or worth unless one is informed that the matter is pending . . . ." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (internal citations omitted).

215.    "Fundamental fairness, if not due process, requires that the execution protocol that will regulate a prisoner's death be forwarded to him in prompt and timely fashion." *Oken v. Sizer*, 321 F. Supp. 2d 658, 664 (D. Md. 2004), *stay vacated*, 542 U.S. 916 (2004).

216.    The procedural guarantees of due process apply when a constitutionally protected life, liberty, or property interest is at stake.

217.    A prisoner has a liberty interest in avoiding a mode of execution that constitutes cruel and unusual punishment. *See Lopez v. Brewer*, No. 12-16084, 2012 WL 1693926, at *14 (9th Cir. May 15, 2012) (Berzon, J., concurring in part and dissenting in

part) (*citing Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003)).

218.    Defendants' actions have made it impossible for individual Plaintiffs to obtain the necessary information regarding execution procedures to litigate claims before an execution.  Defendants' approach to devising, announcing, and recording their execution procedures deprives Plaintiffs of their Fourteenth Amendment procedural guarantee of meaningful access to the courts. *See Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002) (recognizing that state officials' cover-up of facts relevant to litigation of constitutional claim can result in denial of meaningful access to the courts).

219.    Rather than devise and follow a written protocol that provides necessary details of ADC's executions procedures, Defendants have instead afforded broad discretion to the ADC Director in carrying out executions.

220.    Defendants, however, use this discretion to make last-minute changes to the written protocol.  For example, under the January 2012 Protocol, which was in place for Moormann's execution, ADC was required to inform the prisoner seven days before his execution whether he would be executed with a one-drug or three-drug protocol.  Although ADC informed Moormann that it would be using a three-drug protocol in carrying out his execution, it realized only two days before Moormann's execution that it did not have the necessary drugs.  ADC notified Moormann only forty-eight hours before the execution that a one-drug protocol would be used to carry out his execution.

221.    Defendants also make last-minute attestations to the Ninth Circuit limiting the Director's discretion for each particular execution.  For example, on the eve of Moormann's and Towery's executions, and on the eve of Lopez's May 16 scheduled execution, Defendants made representations regarding the qualifications of the IV Team and attorney visitation that are different from the written protocol.

222.    As a result, the January 2012 Protocol—which was in effect for the executions of Moormann, Towery, Kemp, and the scheduled execution of Lopez on May 16—was revised through *ad hoc* representations made by Defendants.

223.   Immediately before Lopez's May 16 scheduled execution, Defendants represented that a doctor and a nurse with seventeen years' experience would be setting the IV lines.  On  June 7, 2012, Defendants indicated that the nurse will not participate in Lopez's execution.  The only information provided about the individual replacing the nurse is that he or she is currently licensed or certified to place IV lines.  No information has been provided to indicate how long this person has been licensed or if this person has any experience.

224.   Besides the fact that Defendants have created a procedure that allows them to shield themselves from litigating the constitutionality of their written protocol by making last minute attestations to the Court, Defendants' actions have also prevented Plaintiffs from knowing what occurs during an execution.  By failing to provide public or attorney access to the execution  procedure involving the setting of IV lines, failing to record in detail what occurs during this process, and restricting a prisoner's speech during his last statement, Defendants have effectively prevented Plaintiffs from knowing any information about the execution process and having a fair chance to litigate their claims.

225.   As a result, Plaintiffs are denied sufficient notice of the policies, practices, and procedures to be followed during their own individual executions, and are also denied the ability to challenge the written protocols in the courts.  The combination of these actions results in a procedural due-process violation.

226.   Unlike the *Dickens* Protocol, the June 2012 Protocol provides no notice regarding where ADC intends to site the IV catheters that will be used to administer the lethal drugs.  The June 2012 Protocol does not allow witnesses to observe this part of the execution.  ADC's practice during the last eight executions has been to open the curtains to witnesses once the IV has been set and the drugs are ready to be administered.  Although ADC informed Plaintiff Lopez on the same day that it published the June 2012 Protocol that it will allow witnesses to view the insertion of IV lines during his execution, ADC did not adopt this procedure as part of the protocol.

227.   Unlike the *Dickens* Protocol, the June 2012 Protocol does not require the primary IV line to remain uncovered.  Therefore, witnesses may not be able to observe the line through which the lethal drugs are administered.

228.   The June 2012 Protocol also removed the venous access check and provides no time limit for setting IV lines.  Plaintiffs will have no information in advance of their execution regarding what veins that ADC deems accessible for placing the IV lines.

229.   During the execution of Robert Towery, Towery was punctured at least seven times while ADC attempted to set a catheter in his arms.  At some point while ADC attempted to unsuccessfully set IV catheters in his arms, Towery asked to speak with his attorney.  Towery was denied access to his attorney.   When Towery's attorney inquired about the execution process, in which there was a delay, his attorney was not provided any information.

230.   It took ADC approximately one hour to ultimately place two IV lines in Towery.

231.   ADC's execution logs do not provide any detail regarding what occurred during this hour.  The logs only indicate that multiple attempts were made but were unsuccessful.

232.   An autopsy revealed that Towery's veins were pliable, and were not hardened or otherwise compromised.

233.   Because Towery was denied access to his counsel and because the logs do not record any detail regarding the IV process, Plaintiffs have no further information regarding Towery's execution at this time.

234.   ADC's execution logs from Kemp's executions indicate that there was a "small problem with setting up the EKG" but give no additional information regarding the problem.

235.   The June 2012 Protocol requires the Special Operations Team Recorder to document the amount of drug administered and to confirm that it was administered in the

correct order.  Unlike other portions of the log that are handwritten, this information is preprinted on the log.  There is no indication that this was verified contemporaneously with the execution.

236.   By refusing to keep detailed accounts of the pre-execution and execution events, ADC makes "the gathering of [relevant] facts by condemned prisoners so difficult that meaningful judicial consideration at a relevant time is not possible." *Lopez*, 2012 WL 1693926, at *15 (Berzon, J., concurring in part and dissenting in part).

237.   ADC has also informed prisoners that the microphone would be turned off during their last statement if they said anything against ADC's interest.  This would prevent a prisoner from being able to describe any problems or pain that occurred during the IV procedure.

238.   It is only because Towery and his counsel developed a code that limited information was discovered about his execution.

239.   Witnesses also indicated that it appeared Kemp continued to move his lips after the microphone was turned off during his final statement.

240.   Plaintiffs have, at a minimum, identified "nonfrivolous" and "arguable" underlying claims supporting their claim of denial of access to the courts. *Lewis v. Casey*, 518 U.S. 343, 353 & n.3 (1996). Specifically, undisputed facts from Towery's execution support a non-frivolous Eighth Amendment claim.

241.   Defendants' actions insulate their execution procedures from constitutional review, and prevent Plaintiffs from obtaining the necessary proof to demonstrate an Eighth Amendment violation.  *See Lopez*, 2012 WL 1693926, at *5 ("Arizona's ad hoc approach risks going beyond *Baze*'s safe harbor"); *Lopez v. Brewer*, No. 12-16084, 2012 WL 1760700, at *3 (9th Cir. May 18, 2012) (Berzon, J., concurring in part and dissenting in part) (denial of reh'g en banc) (noting that Defendants fail to record "information as to the causes and impact of difficulties such [as] those encountered during Towery's execution—difficulties that, for all we now know, might be 'sure or very likely to cause ... needless suffering,' *Baze*,

553 U.S. at 50, and might indeed have caused Towery such suffering.").

242.   "The inability of the class of condemned prisoners to procure details about the execution process is troubling." *Lopez*, 2012 WL 1693926, at *5.  Defendants have deprived and continue to deprive Plaintiffs of their right to notice and an opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment.

## THIRD CLAIM FOR RELIEF

**Defendants deny Plaintiffs Access to Counsel and the Courts Under the Protocol As Written  (1st, 5th, 8th, and 14th Amendments; 42 U.S.C. § 1983; 18 U.S.C. § 3599)**

243.   Plaintiffs incorporate by reference each and every statement and allegation set forth in this Complaint as if fully set forth herein.

244.   The June 2012 Protocol on its face violates Plaintiffs' federal constitutional rights to due process and to access to the courts, and thereby implicates their right to be free from cruel and unusual punishment.  U.S. Const. amends. I, V, VIII & XIV.

245.   Sections 710.11, 1.5.1, and 1.5.2 of DO 710 deny Plaintiffs legal visits after 9:00 p.m. the day prior to a scheduled execution.  Instead, Plaintiffs will only be permitted telephone contact with the attorneys of record.  The telephone calls will take place in a holding cell where ADC officers will be present.  There is no opportunity for privileged communication.

246.   "The difficulty with the State's variable limitation on attorney visits on the morning of the execution is that an individual petitioner has no expectation baseline." *Lopez v. Brewer*, No. 12-16084,  2012 WL 1693926, at *8 (9th Cir. May 15, 2012).

247.   Despite the fact the Ninth Circuit has ordered Defendants to allow prisoners to have legal visits up until an hour before their execution, *see Towery v. Brewer*, 672 F.3d 650, 658 (9th Cir. 2012); *Lopez v. Brewer*, No. 12-16084, 2012 WL 1693926, at *8 (9th Cir. May 15, 2012), ADC has not changed its protocol.  This change could have been made when its protocol was amended on June 5, 2012.

248.   Plaintiffs have a federal constitutional right to be free from cruel and unusual

34

punishment and to be competent during their execution.  *See* U.S. Const. amends. VIII & XIV; *Ford v. Wainwright*, 477 U.S. 399 (1986).

249.   Plaintiffs are entitled to appointed counsel throughout the execution procedure. *See* 18 U.S.C. § 3599(e); *Harbison v. Bell*, 556 U.S. 180 (2009).  Plaintiffs are entitled to have access to counsel in every proceeding subsequent to counsel's appointment, including the day of an execution, in order to pursue legal claims that may arise.

250.   Plaintiffs also have a due-process and a First Amendment right to access to the courts, which includes asserting a claim that their Eighth and/or Fourteenth Amendment rights have been violated, or will be violated, at any time during their proceedings.  *See Bounds v. Smith*, 430 U.S. 817, 821 (1977) (affirming that "prisoners have a constitutional right of access to the courts"); *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) (noting that "right of access to the courts . . . is founded in the Due Process Clause").

251.   Plaintiffs' right to access the courts inherently injects the issue of the right of meaningful access to counsel.  *See Cooey v. Strickland*, No. 2:04-cv-1156, 2011 WL 320166, at *7 (S.D. Ohio Jan. 28, 2011).

252.   Plaintiffs will have no means by which to meaningfully access the courts if they are denied privileged communication with attorneys in the twelve hours prior to an execution. Plaintiffs' ability to openly confer with counsel makes counsel's presence constitutionally valuable to Plaintiffs and thus renders meaningful the ability to access the courts on Plaintiffs' behalf.

253.   ADC has no legitimate governmental interests that outweigh Plaintiffs' constitutional right to access the courts.  This is evident by the fact that in the past, ADC has permitted twenty-eight condemned prisoners to have in-person visitation with their attorneys on the day of their execution.

254.   If circumstances arise immediately prior to Plaintiffs' executions that present a constitutional injury under the Eighth or Fourteenth Amendments, certainly Plaintiffs have the right to litigate those claims.

255.   The only way to protect Plaintiffs' rights would be to guarantee access to counsel in the hours immediately preceding an execution, who could in turn petition the courts for appropriate relief.  Because the June 2012 Protocol strips away this right, it is unconstitutional on its face.

## FOURTH CLAIM FOR RELIEF

**Defendants deny Plaintiffs Access to Counsel and the Courts Under the Protocol As Applied  (1st, 5th 8th, and 14th Amendments; 42 U.S.C. § 1983; 18 U.S.C. § 3599)**

256.   Plaintiffs incorporate by reference each and every statement and allegation set forth in this Complaint as if fully set forth herein.

257.   The June 2012 Protocol as applied violates Plaintiffs' federal constitutional rights to due process and to access to the courts and thereby implicates their right to be free from cruel and unusual punishment.  U.S. Const. amends. I, V, VIII & XIV.

258.   The June 2012 Protocol gives the Director overbroad discretion in carrying out an execution.   The actions of Defendants have violated or will violate Plaintiffs' constitutional rights.

259.   Plaintiffs have a federal constitutional right to be free from cruel and unusual punishment. *See* U.S. Const. amend. VIII.  "Punishments are cruel when they involve torture or a lingering death."  *In re Kemmler*, 136 U.S. 436, 447 (1890).

260.   Plaintiffs are entitled to appointed counsel throughout the execution procedure. *See* 18 U.S.C. § 3599(e); *Harbison v. Bell*, 556 U.S. 180 (2009).  Plaintiffs are entitled to have access to counsel in every proceeding subsequent to their appointment, including during an execution, in order to pursue legal claims that may arise.

261.   The June 2012 Protocol does not have a provision allowing a prisoner to have access to counsel if necessary at any point during the insertion of IV lines.  In practice, ADC will deny a prisoner the right to counsel during this procedure if counsel is requested.

262.   The June 2012 Protocol also permits the Director to draw the curtains in the execution chamber "prior to the conclusion of the execution if necessary and then reopened

when the execution resumes."  (DO 710, § 1.5.1.2.)

263.    Robert Towery was punctured at least six times during the attempt to set a catheter in his arms.  During ADC's attempt to unsuccessfully set IV catheters in his arms, Towery asked to speak with his attorney.  Towery was denied access to his attorney.  When Towery's attorney inquired about the execution process, in which there was a delay, his attorney was not provided any information.  Towery was denied his right to access the courts and present an Eighth Amendment challenge to Defendants' actions.

264.    Circumstances arose during Towery's execution for which he should have been permitted to access his counsel and the courts.  *See Broom v. Strickland*, Complaint, ECF No. 3, No. 09-cv-00823-GLF (S.D. Ohio Sept. 18, 2009) (alleging Eighth Amendment violations where numerous unsuccessful attempts were made to access prisoner's veins during execution); *see Broom*, Opinion and Order, ECF No. 48 at 4 (finding that "[t]here is no doubt that the Eighth Amendment applies to Plaintiff's situation").

265.    If circumstances arise during Plaintiffs' execution similar to that which occurred with Robert Towery, they would have a legal claim that their right to be free from "torture or a lingering death" was being violated.  The only way to protect their rights and to ensure that the violation be immediately stopped would be through access to counsel, who could in turn seek redress in the courts.

266.    Defendants' actions and their application of the June 2012 Protocol prevent Plaintiffs from asserting this right; those actions are therefore unconstitutional.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

(1)    Injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing Plaintiffs until such time as Defendants can demonstrate that measures are in place to allow for Plaintiffs' execution in a manner that complies with the First, Fifth, Eighth, and Fourteenth Amendments to the United States

Constitution;

(2)     Injunctive relief ordering Defendants, their officers, agents, servants, employees, and all persons acting in concert with them to allow Plaintiffs to have access to counsel on the day of the execution up until one hour before the execution;

(3)     Injunctive relief ordering Defendants, their officers, agents, servants, employees, and all persons acting in concert with them to allow Plaintiffs to have access to counsel during the insertion of IV catheters;

(4)     Injunctive relief ordering Defendants, their officers, agents, servants, employees, and all persons acting in concert with them to not make changes to the written lethal-injection protocol after a Warrant of Execution has been issued;

(5)     Injunctive relief preventing Defendants from using illegal (e.g., non-FDA-approved) lethal-injection drugs currently in Defendants' possession, as well as any that Defendants may acquire in the future;

(6)     Appropriate and necessary discovery and an evidentiary hearing to permit Plaintiffs to prove their constitutional claims;

(7)     Costs and attorney fees; and

(8)     Any such other relief as the Court deems just and proper.

Respectfully submitted this 3rd day of July, 2012.

Jon M. Sands
Federal Public Defender
Dale A. Baich
Robin C. Konrad
Cary Sandman

David J. Sepanik
Flora F. Vigo
Amanda R. Conley
O'Melveny & Myers LLP

By:  s/Dale A. Baich
Counsel for Plaintiffs Rogovich, Stanley, Cook, Stokley, and Hooper

38

**Certificate of Service**

I hereby certify that on this 3rd day of July, 2012, I electronically transmitted the foregoing to the Clerk's office using the CM/ECF System for filing.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Michelle Young
Legal Assistant
Capital Habeas Unit